MANAGEMENT COMPUTER SERVICES, INC., a Wisconsin Corporation, Plaintiff-Appellant-Cross Respondent, †

v.

HAWKINS, ASH, BAPTIE & CO., a Wisconsin Partnership, Hawkins, Ash, Baptie, Inc., a Wisconsin Corporation, David D. Baptie, James O. Ash, R. Roy Campbell, Robert J. Daley, Walter L. Leifeld, Larry E. Vangen and Jack E. White, Defendants-Counter Claimants-Respondents-Cross Appellants,

MANAGEMENT COMPUTER SERVICES, INC., Counter Defendant-Appellant.

Court of Appeals

*No. 93-0140. Oral argument April 21, 1994.—Decided August 31, 1995.*

(Also reported in 539 N.W.2d 111.)

†Petition to review granted.

582

584

585

586

587

589

For the plaintiff-appellant-cross respondent the cause was submitted on the brief of *Thomas D. Bell* and *Matthew A. Biegert* of *Doar, Drill & Skow, S.C.* of New Richmond. Oral argument by *Thomas D. Bell*.

For the defendants-counter claimants-respondents-cross appellants the cause was submitted on the brief of *Daniel W. Hildebrand* and *Steven J. Kirschner* of *Ross & Stevens, S.C.* of Madison. Oral argument by *Daniel W. Hildebrand*.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. The appellant, Management Computer Services, Inc. (MCS), designs and programs computer software. One part of its business is licensing computers, software, training, supplies and support designed to meet the accounting needs of public housing authorities (PHA's). Respondent Hawkins, Ash, Baptie & Co. (HABCO) is a Wisconsin partnership and

a public accounting firm. It provides accounting services to PHA's. Respondent Hawkins, Ash, Baptie, Inc. (HABINC) is a corporation owned by HABCO. It licenses turnkey computer systems[1] to PHA's. The individually named defendants are HABCO partners.[2]

MCS's complaint alleged that HABCO conspired to copy, use and sell MCS products, including its computer software, without authority from MCS in breach of its agreement with MCS, contrary to Wisconsin criminal and civil statutes. HABCO counterclaimed that MCS's breach of the contract excused HABCO's obligation, if any, to purchase equipment from MCS and to make certain payments to MCS.

The case was tried in 1991. The jury found: (1) HABCO had materially breached its 1979 contract with MCS by failing to purchase computer hardware from MCS, failing to pay twenty-five percent of the program value to MCS for use of the contract software, and by failing to compensate MCS for the use of proprietary software, and that MCS's damages from those breaches amounted to $740,000, $530,000 and $250,750, respectively; (2) MCS breached the contract by failing to pay HABCO ten percent of the program value for contract software provided and installed for HABCO's clients, and that HABCO's damages in this regard were $5,140; (3) HABCO intentionally converted MCS's software contained on backup tapes without MCS's consent, that HABCO's actions seri-

---

[1] A turnkey system is a complete computer system including hardware, software, installation, training and support services.

[2] Those individuals are David D. Baptie, James O. Ash, R. Roy Campbell, Robert J. Daley, Walter H. Leifeld, Larry E. Vangen and Jack E. White. We refer to the respondents collectively as HABCO or the respondents.

ously interfered with MCS's right to possess and use that property, and that MCS's conversion damages in this regard were $65,000; (4) HABCO was unjustly enriched by copying MCS's software, and the reasonable value of the benefit HABCO retained is $1 million; and (5) HABCO's copying MCS's backup tapes was outrageous. The jury assessed $1,750,000 in punitive damages against HABCO.

The trial court changed answers in the verdict. It eliminated the contract and unjust enrichment damages, reduced MCS's conversion damages to $62,000, and ordered a new trial under § 805.15(6), STATS., on punitive damages (both as to whether defendant's conduct was outrageous and as to the amount of punitive damages), unless MCS accepted a reduced award of $50,000. MCS rejected the $50,000 award. At the second trial, MCS called only one witness, asked five introductory questions and rested. The court dismissed MCS's punitive damages claim. That appeal brings before us all prior orders and rulings adverse to MCS, none of which have been previously appealed. RULE 809.10(4), STATS.

The respondents have cross-appealed. They assert that the trial court should have dismissed MCS's conversion claim for failure to prove its damages and should have granted frivolous costs and sanctions against MCS for its default of proof at the retrial of the punitive damage issue.

The issues are: (1) whether the trial court correctly set aside the breach-of-contract verdict against HABCO; (2) whether the evidence supports the finding that the respondents were unjustly enriched; (3) whether the evidence supports the award for conversion; (4) whether (a) the punitive damages award is excessive, (b) the trial court erred by ordering a retrial

after MCS had declined a remittitur and (c) MCS waived its right to complain about the scope of the second punitive damages trial; (5) whether the court erred in tolling interest on the verdict from June 1992 until October 1992; and (6) whether the court erred in dismissing MCS's Wisconsin Organized Crime Control Act claim.

## 1. BREACH OF CONTRACT

MCS alleged in its complaint that by the terms of the agreement between it and HABCO, the latter agreed to pay MCS twenty-five percent of the value of MCS software on each computer system HABCO installed and operated, and HABCO agreed to purchase computers through MCS for the MCS software it used on non-MCS computers. HABCO failed to pay MCS twenty-five percent of the value of the software, and HABCO failed to purchase computers through MCS for each installation on which it used MCS contract software.

Probably because the agreement between the parties contains no provisions directly providing as MCS contends, MCS claimed the provisions of the contract were ambiguous and it sought leave before the trial to submit parol evidence on the intention of the parties regarding their contractual obligations. The trial court held that the agreement was ambiguous, and at the trial it admitted parol evidence on the parties' intent. The jury found that HABCO had materially breached the contract with MCS by "failing to purchase computer hardware from MCS," "failing to pay 25 percent of the program value to MCS for use of the contract software," and "failing to compensate MCS for the use of the proprietary software," and MCS sustained dam-

ages of $740,000, $530,000, and $250,750, for those respective breaches.

After the verdict HABCO moved the court to reverse its pretrial ruling. The court did so. It held that the contract was too indefinite to be enforced in the respects that MCS claimed, and vacated the jury's answers to the breach of contract questions, including, of course, the damage questions. We affirm the ruling.

When a trial court is asked to change an answer to the verdict, the evidence is viewed in the light most favorable to the verdict and the answer must be affirmed if it is supported by any credible evidence. *Nelson v. Travelers Ins. Co.*, 80 Wis. 2d 272, 282-83, 259 N.W.2d 48, 52-53 (1977). MCS contends that the evidence so viewed supports the verdict on the breach of contract questions.

But the rule MCS relies on applies to issues the jury must decide. Whether an agreement is ambiguous is a question of law for the court. *Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 467, 449 N.W.2d 35, 40 (1989). Whether the contract is sufficiently definite to be enforced as one party contends it should be enforced is also a question of law. The court's pretrial decision that the contract was ambiguous did not prevent it from later deciding whether, as a matter of law, the contract is sufficiently definite to be enforced, insofar as it covers the party's contractual obligations that the jury found HABCO had violated.

To be enforceable the contract must express the essential commitment and obligations of each party with reasonable certainty. *Witt v. Realists, Inc.*, 18 Wis. 2d 282, 297, 118 N.W.2d 85, 93 (1962). The minds of the

594

parties must meet on the essential terms. *Todorovich v. Kinnickinnic Mut. Loan & Bldg. Ass'n*, 238 Wis. 39, 42, 298 N.W. 226, 227 (1941).

When we review a trial court's ruling on whether a contract is sufficiently definite, we examine the contract to determine what the parties contracted to do, not to make or reform it. What the parties contracted to do is not necessarily what they intended to agree on but what they did agree on, as evidenced by the language they chose. *Wisconsin Marine & Fire Ins. Co. Bank v. Wilkin*, 95 Wis. 111, 115, 69 N.W. 354, 354 (1897) (quoted with approval, *Marion v. Orson's Camera Ctrs., Inc.*, 29 Wis. 2d 339, 345, 138 N.W.2d 733, 736-37 (1966)).

The first question asked of the jury, whether HABCO violated the contract by failing to purchase computer hardware from MCS, is quickly answered. The agreement provides that HABCO is to purchase a single-computer system, and it is undisputed that HABCO did. Nothing in the contract required HABCO to purchase computers from MCS other than the single system it in fact purchased. And nothing in the contract provides that HABCO is to purchase additional computer systems from MCS. The court properly vacated the jury's answer to the first question and the $740,000 award.

The second question, whether HABCO breached the agreement by failing to pay twenty-five percent of the program value to MCS for the use of contract software, is answered by reference to the following provision in the contract:

> HABCO shall pay MCS 25 percent of the program value as identified in this Agreement for the use of the jointly owned software on each *additional computer system purchased through MCS* and installed or operated by HABCO.

(Emphasis added.) It is undisputed that HABCO did not purchase additional systems from MCS. The trial court properly vacated the jury's finding that HABCO had breached the contract as to the twenty-five percent provision and the $530,000 award based on that breach.

The trial court properly vacated the jury's affirmative answer to the question whether HABCO had breached the agreement by "failing to compensate MCS for use of the proprietary software." This question must have been put to the jury in accordance with MCS's theory of the case: that when HABCO purchased computer equipment from a vendor other than MCS, the contract required HABCO to pay twenty-five percent of the program value for the use of MCS software with that equipment. MCS's president, Robert A. Sierp, testified that this was his understanding of the agreement. Since it is undisputed that HABCO used MCS software with computers it bought from vendors other than MCS, it is arguable that HABCO breached the contract when it used MCS software on non-MCS computers. For that reason, the jury could have been asked whether HABCO's use of MCS software on non-MCS computers breached the contract between the parties, and MCS's damage, given that breach. But the jury was not asked those questions. The jury was asked whether HABCO breached the agreement by "failing to compensate MCS for their use of the proprietary software." That question referred the jury to the agree-

ment, and it makes no provision for compensation to MCS for HABCO's use of proprietary software on non-MCS equipment. The jury could answer the question affirmatively only on the basis of parol evidence. When the court subsequently ruled that the contract was insufficiently definite to be enforced, as MCS would have it enforced, MCS was left with the quoted question and award based on a theory of the case which no longer applied.[3]

We conclude that we must affirm the trial court's ruling vacating the verdict with respect to MCS's claim that HABCO breached the contract.

## 2. DAMAGES FOR CONVERSION

In the early 1980's, to ensure that it had a copy of its software if a fire or other damage occurred at its place of business, MCS stored copies of its computer program backup tapes in HABCO's vault. Sierp testified there was no written agreement regarding storage. Nor was there a written agreement that HABCO had to keep the tapes secure or could not "look" at them. He could not recall whether MCS paid HABCO for storage.

In 1981 or 1982, HABCO's data-processing manager and a HABCO partner loaded MCS's backup tapes on HABCO's computer and copied MCS's payroll, accounts receivable and accounts payable software, all without the permission or knowledge of MCS. HABCO concedes that it converted the software and used some of it. In 1990, HABCO replaced the payroll and

---

[3] This case has nothing to do with the trial court's exercise of discretion when framing the verdict. No party objected to the form of the verdict. The form was correct when applied to MCS's theory of the case. That theory was rejected on postverdict motions. That rendered the verdict questions inapplicable.

accounts payable software with new software it bought from an organization other than MCS.

An owner of converted property may recover its value at the time of the wrongful taking. *Production Credit Assoc. v. Nowatzski*, 90 Wis. 2d 344, 354, 280 N.W.2d 118, 123 (1979). Interest to the date of trial may also be recovered. *Id.* The jury was instructed only that if HABCO "wrongfully took or converted software from MCS's backup tapes, then you are to award MCS as damages, the value of its property at the time of the wrongful taking." The jury awarded $65,000 to MCS to compensate it for the value of the software copied from the backup tapes. On motions after verdict, the trial court reduced the award to $62,000. It held that the only evidence on the conversion damages was the amount HABCO paid in 1989 and 1990 to replace the copied software, $62,000. MCS argues that the $65,000 award must be reinstated, and we agree.

Damages need only be proved to a reasonable certainty. *Production Credit Assoc.*, 90 Wis. 2d at 356, 280 N.W.2d at 124. Unliquidated tort damages need not be fixed with mathematical precision. *Cutler Cranberry Co. v. Oakdale Elec. Coop.*, 78 Wis. 2d 222, 233, 254 N.W.2d 234, 240 (1977). A fair and reasonable estimate is all that the law requires. *Id.* at 234, 254 N.W.2d at 240. Conversion, of course, is a tort.

MCS established its damages for conversion with sufficient definiteness. The jury could have taken into account that between the conversion in the early 1980's to the date of trial in 1991, the value of the use of

$62,000 amounts to some $3,000.[4] We vacate that part of the order which reduces the award and direct the trial court to reinstate it and to award judgment to MCS for that amount.[5]

### 3. UNJUST ENRICHMENT

That HABCO's tortious conduct unjustly enriched it is undisputed. The trial court made no finding or conclusion to the contrary. The court ruled, however, that the separate awards for conversion and unjust enrichment duplicated each other because, it said, the damages for unjust enrichment, in this case, were the same as the damages for the conversion. It set aside the $1 million unjust enrichment award for the additional reason that no credible evidence supported it. We need not discuss the duplication issue.[6]

■■■

Tort damages and restitution are different in purpose and measurement. The differences are critical to this case. Damages for conversion are designed to compensate the plaintiff "for the loss sustained because his property was taken." *Traeger v. Sperberg*, 256 Wis. 330, 333, 41 N.W.2d 214, 216 (1950). Restitution, the recovery for an unjust enrichment, is granted for another

---

[4] It may also have taken into account that the copied software included an accounts receivable program, while the replacement software apparently did not.

[5] We do not reach HABCO's contention that the trial court should have dismissed MCS's conversion claim because MCS failed to prove damages.

[6] Duplication between the $65,000 award for conversion and the $1 million unjust enrichment award seems unlikely if the jury followed its instructions, but if duplication occurred it could easily be eliminated by deducting $65,000 from the $1 million award.

reason, that it would be inequitable to allow a defendant to retain a benefit without paying for it. *Ramsey v. Ellis*, 168 Wis. 2d 779, 785, 484 N.W.2d 331, 333 (1992). Unjust enrichment is not dependent on loss to the plaintiff.

The differences between tort damages and restitution are the reason why a tort victim may seek restitution from the tortfeasor. The tort victim may bring an action for restitution because the victim has suffered little loss from the tort. LORD GOFF & GARETH JONES, THE LAW OF RESTITUTION 714 (4th ed. 1993). *See also* GEORGE E. PALMER, THE LAW OF RESTITUTION § 2.3 at 60 (1978):

> In many instances the most important difference between quasi contract and the tort remedy lies in the measure of recovery. Sometimes there will be no such difference, but often there will be, since the damage action is designed to provide money compensation for harm to the victim of the tort, whereas quasi contract is aimed at awarding him the money value of the benefit to the tortfeasor. When this leads to differences in the amount of recovery, the advantage will sometimes be in the tort action but frequently it will be in the quasi contract action. (Footnote omitted.)

MCS offered two exhibits to establish its loss from the conversion, and that evidence was admitted. MCS argues in this appeal that the evidence it provided to establish its conversion damages is a basis for the jury's award of $1 million for unjust enrichment.[7] We disagree.

---

[7] MCS offered other exhibits specifically designed to establish HABCO's unjust enrichment. The court refused to admit those exhibits, and MCS has not sought review of those rulings.

The two exhibits MCS offered to establish its conversion damages are accounting studies. The studies are designed, on the basis of HABCO's own records, to show that HABCO used MCS's software to process over 200,000 items for itself and its clients, that MCS could have provided that service to HABCO, and that the charges MCS would have made to HABCO for that service amount to $191,880.

There is no doubt but that MCS offered the two exhibits to establish its damages for the conversion. When arguing admissibility of the exhibits, trial counsel for MCS noted several times that the exhibits were offered in support of its conversion claim.

When moving for admission of the two exhibits, trial counsel for MCS correctly argued that two methods exist to calculate damages for conversion: (1) the value of the property at the time it is taken plus interest, and (2) the value of the property plus its rental value. Interest and rental value are alternative measures of damages to be added to the value of converted property. *Production Credit Assoc.*, 90 Wis. 2d at 356, 280 N.W.2d at 124.

Although the trial court admitted both exhibits, its jury instructions made them irrelevant for the conversion claim. The trial court instructed the jury: "If the defendant wrongfully took or converted software from MCS's backup tapes, then you are to award MCS damages, the value of its property at the time of the wrongful taking." No mention is made of rental value. Because the jury awarded MCS only $65,000 damages for the conversion, the only reasonable inference is that the jury relied on the instruction quoted above and did not rely on the two exhibits and the $191,880 they reflect.

On appeal MCS proposes to use the two exhibits to prove unjust enrichment by equating the "rent" it would have received had HABCO paid MCS for the use of the software or had MCS used the software to serve HABCO and its clients and charged for that service. The two exhibits do not support those contentions.

The exhibits do not show the cost HABCO would have incurred had it paid MCS for the use of the software. HABCO would have used its own computers and its own personnel, all at its own cost, had it "rented" the software. Moreover, the exhibits show only the charges MCS would have made and the "direct expenses" MCS would have incurred had it used the tapes with its computers and personnel to serve HABCO. Had MCS charged HABCO for those services, MCS would have had a profit, but lost profits to a plaintiff do not prove unjust enrichment to a defendant. *Graf v. Neith Co-op. Dairy Prods. Assoc.*, 216 Wis. 519, 523, 257 N.W. 618, 620 (1934).

MCS relies upon a third exhibit, "HABCO/PHA Initial Contract Sales Data"[8] to establish $357,300 of unjust enrichment to HABCO. MCS arrives at that number by adding two columns in the document identified as "AP" and "GPR." The first column, "AP" refers to "accounts payable" and the second column "GPR" refers to "general payroll," these being parts of the software HABCO converted. The total for the first column is $216,000 and the total for the second is $141,300.[9]

---

[8] The exhibit is identified as 013895-013904.

[9] The purpose of the exhibit was never established. When trial counsel for MCS moved for admission of the exhibit, in response to an objection by counsel for HABCO and to an inquiry by the court regarding the exhibit's purpose, counsel

MCS contends that the three exhibits "are sufficient to support the jury's verdict of $1 million for unjust enrichment." We disagree.

First, as we have said, the two earlier exhibits showing a total value of $191,880 conversion damages do not establish unjust enrichment to MCS. Second, even adding that amount to the $357,300 total of the third exhibit results in a far cry from the $1 million the jury awarded for unjust enrichment. Third, the gross sales of HABCO's accounts payable and payroll software to housing authorities do not measure the benefit to HABCO, since gross revenues do not account for HABCO's sales expenses and updating costs HABCO required to keep software current. MCS's president admitted that software cannot be used without such continuous updating, and the record so reflects. HABCO also asserts that only small portions of MCS's accounts payable and payroll software found their way into HABCO's software. MCS's reply brief does not rebut those contentions. A proposition asserted by a respondent on appeal and not disputed by the appellant's reply is taken as admitted. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99, 101 (Ct. App. 1994).

MCS cites *Topzant v. Koshe*, 242 Wis. 585, 588-89, 9 N.W.2d 136, 137-38 (1943), as establishing both a tort damages rule and an unjust enrichment rule for our application in this case. The *Topzant* court examined the traditional measure of damage for conversion. That measure includes an option available to the plaintiff when a tortfeasor has subsequently sold the converted

stated that the ten-page exhibit contained information used in other exhibits. Those exhibits have not been identified, so far as we can determine.

chattel for more than its value on the date of taking. In that circumstance, the plaintiff may elect to recover as tort damages the sale price with interest from the date of sale to the date of trial. *Id.* at 588-89, 9 N.W.2d at 138. The *Topzant* court cited *Ingram v. Rankin*, 47 Wis. 406, 420-21, 2 N.W. 755, 766 (1879), for that option. The *Ingram* court commented that the rule

> will prevent the defendant from making profit out of his own wrong, will give the plaintiff the benefit of any advance in the price of the chattels when [the] defendant holds possession of the same at the time of the trial, and on the whole will be much more equitable . . . .

*Ingram*, 47 Wis. at 421, 2 N.W. at 766.

The *Topzant* and *Ingram* decisions are not in point. As we showed at the beginning of this section of our opinion, there is a significant difference between conversion damages (designed to compensate for a loss) and an award for unjust enrichment (designed to prevent the wrongdoer from unjustly retaining a benefit). An attempt to apply the conversion rule to establish unjust enrichment of the wrongdoer fails to take into account the expenses the wrongdoer has had. The *Topzant* rule prevents the wrongdoer from retaining the gross purchase price it received on sale of the converted goods, since that is a price to which the property owner would have been entitled had it made the sale, and in that sense the rule measures a loss to the owner. But loss to the owner does not equate with unjust enrichment of the wrongdoer and is not an alternative method of establishing unjust enrichment to the wrongdoer.

We therefore conclude that the trial court correctly held that the credible evidence does not establish that HABCO enjoyed, and therefore must disgorge, unjust enrichment to it in the amount of $1 million.

## 4. PUNITIVE DAMAGES

The jury found that HABCO's conduct was outrageous and awarded $1,750,000 for punitive damages. When reducing the award to $50,000, the trial court said that HABCO's conduct for which punitive damages could be awarded was not so outrageous or malicious as to merit the award, the award was not reasonably related to MCS's actual damages and the award was so disproportionate to HABCO's conduct that it amounted to a denial of due process of law. The court did not discuss the evidence. The court added only that had the HABCO defendants been charged criminally with theft of the MCS software, the maximum penalty imposable for the theft would have been a $10,000 fine. The court's order for remittitur gave MCS the option of a new trial under § 805.15(6), STATS.,[10] or to accept a $50,000 award. MCS elected a new trial.

We reject the trial court's conclusion that the punitive damage award violates due process. Due process is provided if the standards imposed by a state's trial and

---

[10] Section 805.15(6), STATS., provides in pertinent part:

If a trial court determines that a verdict is excessive or inadequate, not due to perversity or prejudice or as a result of error during the trial (other than an error as to damages), the court shall determine the amount which as a matter of law is reasonable, and shall order a new trial on the issue of damages, unless within 10 days the party to whom the option is offered elects to accept judgment in the changed amount.

appellate courts "impose[ ]a sufficiently definite and meaningful constraint" on a jury's discretion in awarding punitive damages. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991). Those standards must ensure that a particular award is no greater than reasonably necessary to punish and deter. *Id.*

Wisconsin's statutes and case law impose definite and meaningful constraints on a jury's discretion to award punitive damages. The case law establishes the factors to be considered in determining the proper amount to be awarded as punitive damages. They include "the grievousness of the defendant's acts; the degree of malicious intention; the potential damage which might have been done by such acts as well as the actual damage; and the defendant's ability to pay." *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 234, 291 N.W.2d 516, 527 (1980). The jury was instructed regarding those factors, the purpose of punitive damages, and the jury's right to decline to award punitive damages.

Due process requires that the size of a punitive damage award be judicially reviewable to protect a defendant from the danger of arbitrary deprivation of property. *Honda Motor Co. v. Oberg*, 512 U.S. —, —, 129 L.Ed.2d 336, 349-50 (1995). Wisconsin provides that review. Section 805.15(6), STATS., establishes a procedure by which a trial court provides relief from an excessive damage award by determining the amount which as a matter of law is reasonable and ordering a new trial on the issue of damages unless the party to whom the option of remitting the excess amount is offered elects to accept judgment in the changed amount. Case law establishes the scope of appellate review of such an order. *Powers v. Allstate Ins. Co.*, 10

Wis. 2d 78, 102 N.W.2d 393 (1960); *Carlson & Erickson Builders v. Lampert Yards*, 190 Wis. 2d 651, 670-71, 529 N.W.2d 905, 912 (1995).

> The *Powers* court recognized that the circuit court which sees and hears the witnesses has an advantage over an appellate court which can only review the record. Thus a reviewing court will reverse a circuit court's remittitur order only when it finds that the circuit court erroneously exercised its discretion. A reviewing court will not reverse a circuit court's discretionary determination if the record shows that discretion was in fact exercised and there exists a reasonable basis for the circuit court's determination after resolving any direct conflicts in the testimony in favor of the prevailing party, even if the reviewing court would have reached a different conclusion than the circuit court.
>
> If, however, a circuit court fails to analyze the evidence supporting its conclusion that the damage award is excessive, or fails to state the reasoning behind its decision, the reviewing court should place no weight upon the trial court's findings. In such a situation, the reviewing court must then review the entire record and determine, as a matter of first impression, whether the jury award is excessive. In conducting its analysis, the reviewing court must view the evidence in the light most favorable to the party prevailing with the jury.

*Carlson & Erickson Builders*, 190 Wis. 2d at 670-71, 529 N.W.2d at 912 (footnotes omitted).

Our review of the trial court's order reducing the punitive damages award has two parts: first, whether the court properly exercised its discretion when it set aside the $1,750,000 punitive damage award as excessive; second, if it did, whether the court properly gave

MCS the option of accepting a $50,000 award or a new trial.

Because the trial court's reasons for setting aside the $1,750,000 award are sketchy and largely conclusory, we give little weight to that decision. We review the record de novo to determine whether, as a matter of first impression, viewing the evidence in the light most favorable to MCS, the award is excessive. *Carlson & Erickson Builders*, 190 Wis. 2d at 670-71, 529 N.W.2d at 912. We conclude that it is excessive.

Punitive damages are awarded "to punish the wrongdoer and to deter him and others from future similar wrongdoing." *Fahrenberg*, 96 Wis. 2d at 234, 291 N.W.2d at 526-27. If the award is more than enough to meet those purposes, it is excessive. To determine whether it is excessive, we examine the evidence presented to the jury in the light most favorable to its decision. *Carlson & Erickson Builders*, 190 Wis. 2d at 670-71, 529 N.W.2d at 912.

HABCO's wrongdoing—its copying and use of the MCS software—was outrageous and malicious to a high degree. It was done secretly, without the knowledge or consent of MCS. It was done solely for the financial benefit of HABCO. It was done with criminal intent, and MCS rightly refers to it as theft. It was done by HABCO personnel possessing significant responsibilities. HABCO's manager of data processing and a partner of HABCO copied the backup tapes. They worked together. They searched the backup tapes for specific program items HABCO lacked, and they copied those items to their computer, copied from the computer to another tape, printed off the source code and

removed it from their computer.[11] They changed the billing output generated by the stolen accounts receivable software to disguise what they had done.[12] The partner kept the newly created tapes in his office. The manager kept the source code print outs in his office. The theft enabled HABCO to use MCS's software for years.

However, the high degree of outrageousness and maliciousness present here are not the only factors we must consider. The compensatory award and the potential criminal penalties are additional factors for our consideration.

> In *Wozinak v. Local 1111 of UE*, 57 Wis. 2d 725, 731, 205 N.W.2d 369 (1973), *Meke v. Nicol*, 56 Wis. 2d 654, 664, 203 N.W.2d 129 (1973), and *Lisowski v. Chenenoff*, 37 Wis. 2d 610, 634, 155 N.W.2d 619 (1968), this court recognized that compensatory damages and criminal fine[s] are relevant to the assessment of punitive damages. This court has never held, however, that there is any mathematical formula for calculating punitive damages on the basis of the compensatory damages or the criminal fine. Plaintiff argues that the award of $125,000 is about six times the maximum fine of $20,000, if defendant were found guilty of just two counts of receiving stolen property. In *Lisowski v. Chenenoff*, 37 Wis. 2d 610, 155 N.W.2d 619 (1964), the ratio of punitive damages to penalty was 10 to 1, and in *Dalton v. Meister*, 52 Wis. 2d 173, 188 N.W.2d 494 (1971), it was 75 to 1. In *Meke v. Nicol*, 56 Wis. 2d 654, 664, 203 N.W.2d 129 (1973), the punitive damages were 13 times the maximum fine for a similar

---

[11] That way no one could tell they had copied the programs to their computer.

[12] As one of HABCO's clients, MCS would receive bills from HABCO created by the stolen software.

offense. In *Malco v. Midwest Aluminum Sales Co.*, 14 Wis. 2d 57, 66, 109 N.W.2d 516 (1961), the court stated that "[t]here is no arbitrary rule that punitive damages cannot equal 15 times the compensatory damages." In *Dalton v. Meister*, 52 Wis. 2d 173, 181, 188 N.W.2d 494 (1971), the court noted that "there is no arithmetic proportion to which punitive damages should relate to the wealth of the defendant or to the damage done the plaintiff . . . ."

*Fahrenberg*, 96 Wis. 2d at 233, 291 N.W.2d at 526.[13]

The high ratios of the punitive damage award to the compensatory award for tort damages and to the potential criminal fine lead us to conclude that the initial award of $1,750,000 is unnecessary to serve the purposes of deterrence or punishment. The punitive award is almost twenty-seven times the compensatory award of $65,000. The punitive award must bear "a reasonable relationship to the award of compensatory damages." *Tucker v. Marcus*, 142 Wis. 2d 425, 447, 418 N.W.2d 818, 826 (1988). Even with "due regard for the discretion of the jury in assessing punitive damages," *id.* at 447-48, 418 N.W.2d at 826, the award does not bear a reasonable relationship to MCS's compensatory damages. The potential criminal penalty for willfully, knowingly and without authorization copying computer programs where the damages are greater than $2,500 is a fine not exceeding $10,000 or imprisonment not exceeding five years, or both. Sections 943.70(2)(a)

---

[13] The record contains no evidence of the wealth of any respondent. *See Meke v. Nicol*, 56 Wis. 2d 654, 658, 203 N.W.2d 129, 132 (1973) (evidence of an individual defendant's wealth is inadmissible when punitive damages are sought from multiple defendants).

and (3)(b)3, and 939.50(3)(d), STATS. The punitive damages award is 175 times the maximum fine.

We also conclude that the reduced punitive award of $50,000 is insufficient to punish HABCO and to deter others in the future from similar wrongdoing. The compensatory award is in a sense a starting place, since punitive damages equal to compensatory damages are reasonable. *Dalton*, 52 Wis. 2d at 181, 188 N.W.2d at 498. The $50,000 award by the trial court does not even match the compensatory award for conversion, $65,000. The high degree of outrageous conduct and maliciousness exhibited by HABCO is such that a punitive award merely equal to the compensatory award fails to serve the purposes of punishment and deterrence.

We reach that conclusion because the record shows how easy it is to steal computer programs, once possession of the physical software is obtained. One contemplating such a theft and watching the development of the law might well consider that the ease of theft, the low risk of detection and the potential profit are worth the cost if punitive damages merely approximate the amount of compensatory damages. We should dissuade software thieves from reaching that conclusion. In this age of computers and the many uses to which they are put in almost every professional, commercial, industrial and governmental context, deterrence of others similarly situated is even more important than punishing the wrongdoer. We conclude that a punitive award only approximating MCS's compensatory damages is far too little.

To accomplish the dual purposes of punishment and deterrence, we conclude that, as a matter of law,

reasonable punitive damages in this case are $650,000.[14] This amount is approximately ten times the amount of the compensatory damages award, a far more reasonable relationship in this case, and sixty-five times the maximum fine for computer theft. It better satisfies those purposes in the case before us than does the $50,000 award the trial court directed in its remittitur order. Accordingly, MCS should be given the option of accepting judgment for $650,000 in punitive damages, or having a new trial limited to the issue of the amount of punitive damages.

We direct the trial court to modify the judgment by decreasing the amount of the punitive damages award to MCS from $1,750,000 to $650,000, exclusive of costs, unless within twenty-one days from the date of remittitur, MCS files with the clerk of the circuit court a notice in writing that the plaintiff elects to have a new trial limited to the issue of the amount of punitive damages. If such notice is timely filed, the modified judgment for $650,000 punitive damages shall stand reversed and a new trial had on punitive damages.[15]

---

[14] "The *Powers* rule . . . allows both the trial court and the appellate court to determine a reasonable award and to grant the plaintiff the option of accepting that sum or having a new trial. This court has exercised this kind of control in punitive damage cases." *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 307, 294 N.W.2d 437, 461 (1980) (citations omitted).

[15] We fashion our mandate on that in *Powers,* 10 Wis. 2d at 92, 102 N.W.2d at 401, except that we think giving notice to the clerk of circuit court will be more convenient than notice to the clerk of the court of appeals.

## 5. ISSUES ON RETRIAL

The trial court stated that the retrial if MCS elected it, included the issue whether HABCO's conduct was outrageous. The court erred. No reason exists to retry the issue whether HABCO's conduct was outrageous. Liability for punitive damages has been fixed. To retry that issue would deprive MCS of a liability finding. The amount HABCO must pay because of that liability is the only remaining issue. Evidence relevant to the degree of that outrageousness may be presented by both MCS and HABCO, but the jury should be instructed that as a matter of law HABCO's conduct was outrageous. The only question for the jury is the amount of punitive damages, and it should consider the degree of outrageousness in fixing that amount.

The trial court apparently interpreted *Badger Bearings, Inc. v. Drives & Bearings, Inc.*, 111 Wis. 2d 659, 331 N.W.2d 847 (Ct. App. 1983), as holding that a trial court has unlimited discretion in fixing the scope of a new trial. That was not our holding.

In *Badger Bearings*, we said that the trial court might grant a partial new trial when the error is confined to an issue which is "entirely separable" from the others. We concluded that "compensatory and punitive damages are separable and that justice would not be served by mandating a new trial on all damages questions as the invariable alternative to acceptance of a changed amount of punitive damages." *Id.* at 673-74, 331 N.W.2d at 855.

Consequently, because the liability of the respondents for punitive damages will not be an issue, and that issue is separable from the amount of damages, the only issue at the second trial will be the amount of

the punitive damages, and evidence relevant to outrageousness will be admissible only on the degree of that outrageousness.

## 6. INTEREST ON VERDICT

After MCS rejected the $50,000 punitive award, the court scheduled the second trial for June 23, 1992. On June 3, 1992, MCS moved to a continuance, on grounds that counsel (who had been substituted for trial counsel) was not prepared to try the case on that date. HABCO consented to a continuance, provided that interest on the verdict was tolled through the date of the adjourned trial. Counsel for MCS had no objection to that and obtained the oral consent of MCS's president to the continuance. The court scheduled the trial for October 27, 1992, and tolled interest until that date. MCS claims error.

MCS asserts that it has a statutory right to the interest the trial court tolled. Section 814.04(4), STATS., provides that if a judgment is for the recovery of money, interest at the rate of twelve percent per year from the time of the verdict until judgment is entered shall be computed by the clerk and added to the costs. As MCS points out, the statute has no pertinent exceptions.

■■■

However, because counsel for MCS and an officer of MCS consented to a continuance and to tolling interest on the verdict through the date of the adjourned trial, and the trial court relied on that consent, MCS is judicially estopped from claiming that it did not consent. *See Coconate v. Schwarz*, 165 Wis. 2d 226, 231, 477 N.W.2d 74, 75 (Ct. App. 1991) (judicial estoppel precludes a party from asserting a position in a legal proceeding that is inconsistent with a position previously taken). Having consented to the adjournment

614

and to the tolling of interest, it has waived the right to interest on the judgment.

## 7. WISCONSIN ORGANIZED CRIME CONTROL ACT (WOCCA) CLAIM

MCS sought damages under WOCCA, § 946.80-88, STATS. Section 946.87(4), STATS., provides that a person who is injured by reason of any violation of § 946.83 or § 946.85 has a cause of action for twice the actual damages sustained, attorney fees and costs reasonably incurred and, when appropriate, punitive damages. Section 946.83(3), STATS., provides that no person employed by, or associated with, any enterprise may conduct or participate, directly or indirectly, in the enterprise through a "pattern of racketeering activity." Section 946.82(3), STATS., provides in pertinent part:

> "Pattern of racketeering activity" means engaging in at least 3 incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, provided at least one of the incidents occurred after April 27, 1982 and that the last of the incidents occurred within 7 years after the first incident of racketeering activity.

Section 946.82(4) defines "racketeering activity" as any activity specified in 18 U.S.C. § 1961(1) in effect as of April 27, 1982, or the attempt, conspiracy to commit, or commission of any of the felonies specified in particular chapters and sections of the Wisconsin statutes, including § 943.70, the computer-crimes statute. The wilful, knowing and unauthorized copying of data, computer programs or supporting documentation is a crime. Section 943.70.

HABCO moved for summary judgment dismissing MCS's WOCCA claim. The trial court granted the motion because it concluded that any violation of § 943.70, STATS.; that occurred before its effective date is not racketeering activity under § 946.82(4), STATS., and HABCO's copying and use of software are not violations of § 943.70. For that reason, the court concluded that MCS did not establish the requisite number of predicate acts necessary to establish a "pattern of racketeering activity" under § 946.82(3).

MCS contends that each unauthorized copying of the stolen software after § 943.70, STATS., became effective is a separate violation of § 943.70, and therefore each act of unauthorized copying is a separate predicate act under WOCCA. MCS submitted an affidavit to the trial court identifying sixty-three acts of copying which occurred after § 943.70 became effective.

The Seventh Circuit rejected MCS's same contention on the same facts in *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48 (7th Cir. 1989). In that case MCS sought damages from HABCO under 18 U.S.C. § 1961-68, the Racketeer Influenced and Corrupt Organizations Act (RICO). Violation of RICO requires a "pattern of racketeering activity." 18 U.S.C. § 1962. A "pattern of racketeering activity" requires at least two acts of racketeering activity within a defined period. 18 U.S.C. § 1961(5). MCS argued that each time HABCO made another use of the software it had copied, it committed another predicate act under RICO. The Seventh Circuit said,

> If, as MCS alleged, the contract software at issue was proprietary to MCS, then when HABCO first copied that software it in essence stole the software. HABCO's subsequent use of the allegedly stolen

616

software cannot be characterized as subsequent thefts. When a thief steals $100, the law does not hold him to a new theft each time he spends one of those dollars. . . . This is simply not a case that involves long-term criminal conduct or activity that could, in common-sense, be called a pattern of racketeering.

*Management Computer Servs., Inc.*, 883 F.2d at 51.

■

Because WOCCA is patterned after RICO, federal case law interpreting RICO is persuasive authority in our interpretation of WOCCA. *State v. Evers*, 163 Wis. 2d 725, 732, 472 N.W.2d 828, 831 (Ct. App. 1991). We see no reason in this case to apply WOCCA differently from the Seventh Circuit's application of RICO to the same facts. We conclude that the trial court properly granted summary judgment dismissing MCS's WOCCA claim.

## . 8. CROSS-APPEAL

In their cross-appeal, the defendants argue that the trial court should have dismissed MCS's conversion claim because MCS failed to prove its damages, and the court should have granted sanctions against MCS or its counsel.

■

As we have already said, our disposition of MCS's appeal regarding its compensatory damages for conversion disposes of the first issue in the cross-appeal. The second issue is based upon §§ 802.05 and 814.025, STATS., and results from MCS's default of proof at the scheduled new trial on punitive damages. Our disposition of MCS's appeal regarding punitive damages disposes of the second issue.

*By the Court.*—Judgment and orders affirmed in part, reversed in part and cause remanded with directions.

SUNDBY, J. (*concurring*). "Punitive damages have long been a part of traditional state tort law." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984), *quoted in Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15 (1991).[1] In *Wilkes v. Wood*, Lofft 1, 98 Eng Rep 489 (CP 1763), the Lord Chief Justice validated exemplary damages as compensation, punishment and deterrence. (*Cited in Haslip*, 499 U.S. at 15). The history of the excessive fines clause of the Eighth Amendment shows that the clause is applicable to punitive damages. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 286-87 (1989) (O'Connor, J., concurring in part and dissenting in part).

Under the Saxon legal system in pre-Norman England, "the victim of a wrong would, rather than seek vengeance through retaliation or 'blood feud,' accept financial compensation for the injury from the wrongdoer." *Id.* at 287. At some point after the Norman Conquest in 1066, this method of settling disputes gave way to a system in which individuals who had engaged in conduct offensive to the Crown placed themselves "in the King's mercy" so as not to have to satisfy all the monetary claims against them. *Id.* In order to receive clemency, these individuals were required to pay an "amercement" to the Crown, its representative, or a

---

[1] I concur solely to make clear that our review of a jury's award of punitive damages is not deferential. Appellate court review is part of the process due a litigant against whom punitive damages have been awarded.

feudal lord. *Id.* at 287-88 (citing *Tumey v. Ohio,* 273 U.S. 510, 525 (1927)).

Fines and amercements had very similar functions. *Id.* at 289. Fines originated in the Thirteenth Century as voluntary sums paid to the Crown to avoid an indefinite prison sentence or to avoid royal displeasure. *Id.* In practice, it became difficult to distinguish between amercements and fines. However, by the Seventeenth Century, fines had replaced amercements as the preferred penal sanction. *Id.* at 290. The word "fine" took on its modern meaning, while the word "amercement" dropped out of ordinary usage. *Id.* Shakespeare did not distinguish between fines and amercements in the plays he wrote in the late Sixteenth Century. *Id.* In Romeo and Juliet, published in 1597, Prince Escalus uses the words "amerce" and "fine" interchangeably. In this manner, he warned the Montagues and the Capulets not to shed blood on the streets of Verona:

> I have an interest in your hate's proceeding,
> My blood for your rude brawls doth lie a-bleeding;
> But I'll amerce you with so strong a fine,
> That you shall all repent the loss of mine.

*Id.* (quoting Act III, scene 1).

A fascinating account of the development of punitive damages appears in Justice O'Connor's separate opinion in *Browning-Ferris. See* 492 U.S. at 286-95. The *Browning-Ferris* majority questioned Justice O'Connor's conclusion that the word "fine," as used in the late Eighteenth Century encompassed private civil damages. 492 U.S. at 265 & n.7. Justice Blackmun doubted whether Shakespeare appreciated the difference between a "fine" and an "amercement." He observed:

Though Shakespeare, of course,
Knew the Law of his time,
He was foremost a poet,
In search of a rhyme.

*Id.* at 265 n.7.

Justice Blackmun concluded that the "pedigree" of the Eighth Amendment convinced a majority of the Court that the excessive fines clause did not apply to civil damages but was intended to limit only those fines directly imposed by and payable to the government. 492 U.S. at 268.

The majority concluded that the excessive fines clause did not limit the ability of a civil jury to award punitive damages. *Id.* at 271. Justice Blackmun concluded that the practice of awarding damages far in excess of actual compensation for quantifiable injuries was well recognized at the time the framers produced the Eighth Amendment. *Id.* at 274.

The petitioners also asked the *Browning-Ferris* Court to determine whether the punitive damages award therein was excessive under the Due Process Clause of the Fourteenth Amendment. *Id.* at 276. However, the Court deferred that inquiry to another day because petitioners had failed to raise the argument before either the district court or the court of appeals and made no specific mention of it in their petition for *certiorari. Id.* at 276-77.

In *Haslip*, however, the Court made that inquiry. The Court approved the traditional common-law approach for assessing punitive awards. 499 U.S. at 15-17. Under that approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. *Id.* at 15. The jury's determination is then reviewed by trial and appellate courts to

ensure that it is reasonable. *Id.* The Court declined to hold that this common-law method for assessing punitive damages was so inherently unfair as to deny due process and violate the Fourteenth Amendment: "If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." *Sun Oil Co. v. Wortman,* 486 U.S. 717, 730 (1988) (quoting *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31 (1922)), *quoted in Haslip,* 499 U.S. at 17.

The Court said, however, that accepting the common-law manner of computing punitive damages did not require the conclusion that the imposition of punitive damages is never unconstitutional. 499 U.S. at 18. The Court noted again its concern about punitive damages "run wild." *Id.*

I set forth the foregoing history of punitive damages solely to show that our review of an award of punitive damages is not deferential; we are part of the "due process" by which an award of punitive damages is determined. The jury makes its award. The trial court reviews the award. It is then reviewed by our court, and, possibly, our supreme court. *See TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. —, 113 S. Ct. 2711, 2719-20 (1993). The United States Supreme Court has refused to "enshrine" a comparative approach whereby other awards are tested against the award made in a particular case. 509 U.S. at —, 113 S. Ct. at 2720.

The Court has confirmed that a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable cannot be drawn in every case. *Id.* (*citing Haslip,* 499 U.S. at 18). However, a general concern for reasonableness properly enters into the constitutional calculus.

Some courts have held that punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually occurred. "If the defendant's actions caused *or would likely cause* in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater." *TXO*, 509 U.S. at —, 113 S. Ct. at 2721 (quoting *Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897, 909 (W. Va. 1991)).

In *TXO*, a plurality of the Court adopted the principle that a mere "dramatic disparity" between the actual damages and the punitive award is not controlling. 509 U.S. at —, 113 S. Ct. at 2722. In *TXO*, plaintiff's actual damages were $19,000 and the jury awarded $10 million punitive damages. A plurality of the Court affirmed the award.

In a "spotted cow" case, *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir.), *cert. denied*, 114 S. Ct. 443 (1993), the jury awarded Trandes $17,400 in compensatory damages and $750,000 in punitive damages. *Id.* at 657. Trandes alleged that the defendant improperly acquired and used the "Tunnel System," a computer program written by Trandes's president to perform survey calculations for the construction of subway tunnels. *Id.* The Fourth Circuit Court of Appeals affirmed the jury's award but remanded for remittitur or retrial of punitive damages in accordance with a Maryland statute placing a cap on punitive damages. Maryland limits punitive damages to twice compensatory damages. *Id.* at 658.

The Fourth Circuit Court of Appeals concluded that "the evidence is clear that [defendant's] actions were both willful and egregious." *Id.* at 666. The actions which the jury found to be willful and egregious

do not differ greatly from appellant's actions in this case. Numerous employees of the defendant knew or had reason to know that the defendant was not authorized to use the Tunnel System software, but yet the defendant modified the program to misrepresent that it was an authorized user. *Id.*

*TXO* does not provide a great deal of guidance other than fundamental fairness for determining punitive damages. The *Haslip* Court approved a jury instruction which instructed the jury that punitive damages are to punish the defendant and deter it and others from similar conduct in the future. *See Dunn v. Hovic*, 1 F.3d 1371, 1380 (3d Cir.), *modified in part on other grounds*, 13 F.3d 58 (3d Cir.), *cert. denied*, 114 S. Ct. 650 (1993). The district court also told the jury that punitive damages are allowed only for wanton and reckless behavior "[where] defendant's conduct was outrageous because done with an evil motive or done with reckless indifference to the rights of others." *Id.* In *Haslip*, the Court noted that under the applicable Alabama precedent, the factors a trial court considers in scrutinizing a jury verdict for excessiveness of damages are "the 'culpability of the defendant's conduct,' the 'desirability of discouraging others from similar conduct,' the 'impact upon the parties,' and 'other factors, such as the impact on innocent third parties.'" *Dunn*, 1 F.3d at 1381 (quoting *Haslip*, 499 U.S. at 16 (quoting *Hammond v. City of Gadsden*, 493 So. 2d 1374, 1379 (Ala. 1986))).

Wisconsin courts review punitive damage awards much as do the Alabama courts. Courts are particularly likely to approve punitive damage awards where defendant's conduct entails health hazards. *See Dunn*, 1 F.3d at 1383. Courts also consider the ability of the defendant to pay and the extent to which the defendant

has profited from its egregious conduct. *See id.* at 1383-84.

In this case, the plaintiff did not present evidence as to HABCO's net worth. I agree that HABCO's actions were egregious. However, an award of $1,750,000 is unreasonable and will not survive a due process challenge given that HABCO's conduct did not affect the life or health of any individual and MCS can be compensated for its actual damages. An award of $1,750,000 for software theft shocks my conscience. I am satisfied that the award of $650,000 which we make is a sufficient deterrent to HABCO and others who might be similarly tempted to steal and convert computer software.

For these reasons I concur.

DYKMAN, J. (*dissenting*). Had the defendant accountants at Hawkins, Ash, Baptie & Company (HABCO) been lawyers, they would have been disbarred and prosecuted. Stealing from clients is outrageous behavior, and deserves to be substantially penalized. That is what the jury decided when it awarded $1,750,000 in punitive damages to Management Computer Services, Inc. (MCS). But a majority of this court has reduced MCS's compensatory damages from $2,585,750 to $65,000 and has awarded punitive damages of only $650,000 because that figure is exactly ten times the amount of the reduced compensatory award.

The majority fails to understand MCS's theory of recovery and it also adopts a new rule for determining whether a contract is indefinite which is wholly at variance with past precedent. I cannot accept the

624

majority's analyses or conclusions, and, therefore, I dissent.

## BREACH OF CONTRACT

The basic problem with the majority's analysis of the contract between HABCO and MCS is its conclusion that because nothing in the wording of the contract expressly required HABCO to purchase more than one computer from MCS, HABCO did not breach the contract by buying additional computers from other vendors. But MCS did not and does not contend that the words of the contract required HABCO to purchase computers from MCS. Robert A. Sierp, president of MCS, testified: "[HABCO wasn't] required to buy computers from MCS." But that is not the end of the analysis because the contract between HABCO and MCS dramatically limited the use that HABCO could make of the software MCS sold to HABCO. Only if HABCO purchased additional computers from MCS could HABCO use MCS's software on those computers.

The contract reads:

> This software is proprietary to MCS and shall be furnished upon completion under license to HABCO for use on the HABCO computer installation described in this Agreement. MCS shall provide the non-applications software described above at no extra charge for each additional computer system purchased by HABCO through MCS.

Sierp testified:

> [T]he objective was if [HABCO was] going to use that software, that contract software, that [it] would buy a computer from us. If [it] wanted to go off and do some tax reporting, [it] could buy any

computer [it] want[ed] and we weren't—we would not have been involved in that transaction.

Thus, it is apparent from the parties' contract and from Sierp's testimony that although the contract between MCS and HABCO did not require HABCO to buy MCS computers, if HABCO bought computers from another supplier, it could not use MCS software on those computers. What the majority fails to recognize is that without software, the computers bought from another vendor would be useless to develop turnkey computer systems for public housing authorities. The software furnished by MCS was highly specialized software developed at great cost and it was very valuable to a company in the business of licensing computer systems to public housing authorities.

The jury was asked whether HABCO breached its contract with MCS in three respects. It answered "yes" to all three special verdict questions. The majority dislikes the questions asked, and proposes an alternative. But that is not the test appellate courts use when faced with an argument that a jury question was misleading. In *Topp v. Continental Ins. Co.*, 83 Wis. 2d 780, 785, 266 N.W.2d 397, 401 (1978), the court said:

> This court has frequently stated that the form of the special verdict rests in the discretion of the trial court, and the court's chosen form will not be rejected unless the inquiry, taken with the applicable instruction, does not fairly present the material issues of fact to the jury for determination.

Instead of using this deferential review of the verdict used by the trial court, the majority, without considering the court's instructions, reviews the verdict *de novo*, and decides that it would have used alternative language. I cannot join in this *sub silentio* overruling of

*Topp.* It will only cause confusion for future cases where the proper standard of review for special verdict questions is at issue.

HABCO, MCS, the trial court and the jury all understood MCS's theory of its case. I recognize that the jury questions could have been better worded, but when the jury was first asked whether HABCO breached the parties' contract by failing to purchase computers from MCS, the jury answered "yes" knowing that the contract was not worded: "HABCO agrees to purchase all computers from MCS." The jury responded affirmatively because it knew that the only practical way HABCO could have legally used MCS software for public housing authorities was to buy MCS computers. The jury also knew that HABCO avoided the increased cost of purchasing MCS computers by purchasing computers from another vendor and using MCS software on them in breach of the parties' contract. Because purchasing computers from MCS was the only practical way HABCO could avoid breaching the contract, question one of the verdict settled the real issue over which the parties contended. In any event, I cannot conclude that asking question one was an erroneous exercise of discretion, nor that the question failed to fairly present what everyone knew were the material issues of fact in the case.

The same is true of the second breach question. The jury was asked whether HABCO breached the parties' contract by failing to pay twenty-five percent of the program value to MCS for the use of the contract software. The majority's conclusion, that because HABCO did not purchase additional computer systems from MCS, HABCO did not breach the contract, is an overly simplistic answer and does not address MCS's theory of the case. The breach is HABCO's use of MCS

software on non-MCS computers, not HABCO's failure to buy MCS computers. Had HABCO done what it agreed to do, it would have had to purchase MCS computers. It then would have used jointly owned software on those computers and paid twenty-five percent of the program value to MCS. MCS's damages for HABCO's breach of its agreement not to use MCS software on non-MCS computers equalled the twenty-five percent it would have received had HABCO not breached the contract. I conclude that the verdict form for the second question was not an erroneous exercise of discretion and that it fairly presented the material issues of fact in the case.

The final breach question is the only one the majority directly addresses, but it does so in a way which ignores our standard of review of a jury verdict. The jury was asked whether HABCO breached the parties' contract by failing to compensate MCS for the use of the proprietary software. Had HABCO not breached the contract by using MCS software on non-MCS computers, HABCO would have been required by the contract to pay twenty-five percent of the program value because it would have then used the software purchased through MCS. That was exactly what the jury was asked. Though the jury verdict might have been better drafted, or drafted in a manner which the majority would prefer, that is not what this court reviews. Our review is deferential, not *de novo. See Topp*, 83 Wis. 2d at 785, 266 N.W.2d at 401. I conclude that the trial court did not erroneously exercise its discretion in wording the third question of the breach of contract verdict as it did. And, given the focus of the trial, I have no doubt but that the form of the verdict fairly presented the material issues of fact to the jury.

There is a problem, however, with this final breach question. Once the jury found the first breach and awarded damages, the facts show that there would be either no breach of the contract by HABCO's failure to compensate MCS for its use of the proprietary software or no damages for the breach. The contract provided that if HABCO bought additional computers from MCS, MCS would provide HABCO with proprietary software at no extra charge. The jury's affirmative response to the first breach of contract question put MCS in the financial position in which it would have been had HABCO bought additional computers from MCS. MCS would then have provided the proprietary software to HABCO at no cost to HABCO. I would change the answer to breach question number three to "no."

## INDEFINITE CONTRACT

The majority concludes that the parties' contract is too indefinite to be enforced. Yet, it never quotes the part of the contract which it believes is indefinite. Apparently, the majority has adopted a new rule of contract law to the effect that a contract is indefinite if it does not mean what one of the parties contends that it means. I am unaware of such a rule. We look to the contract itself to determine whether it is indefinite and therefore unenforceable. Arthur Corbin notes:

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such

that the court can determine what the terms of that agreement are.

1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 4.1 (1993). This is consistent with the RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981), which provides: "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." The majority holds: "When the court subsequently ruled that the contract was insufficiently definite to be enforced, *as MCS would have it enforced*, MCS was left with the quoted question and award based on a theory of the case which no longer applied." Majority op. at 597 (emphasis added). This new holding looks to the pleadings and the positions taken at trial to determine whether a contract is indefinite. The majority cites no authority for this dramatic change in contract law, and I find none. I believe that the proper test for indefiniteness is to look at the language of the contract to determine whether the contract is too indefinite to be enforced.[1] There is no question but that the contract is sufficiently definite. Even the majority notes: "Since it is undisputed that HABCO used MCS software with computers it bought from vendors other than MCS, *it is arguable that HABCO breached the contract when it used MCS software on non-MCS computers*." Majority op. at 596 (emphasis added).

Once we conclude that a contract was formed, and that HABCO breached it, facts that even the majority grudgingly admits, the only question becomes the

---

[1] Even if we conclude that a contract is ambiguous, we do not necessarily conclude that it is void for indefiniteness. If a contract is ambiguous, we may construe the contract through the use of extrinsic evidence. *Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 379, 254 N.W.2d 463, 467 (1977).

extent of MCS's damages. Because there is evidence to support the damages the jury awarded for HABCO's failure to purchase computer equipment from MCS, and for HABCO'S failure to pay twenty-five percent of the program value for the use of the contract software, I would reinstate that part of the jury's verdict.

## PUNITIVE DAMAGES

The only rationale that I can discern for the majority's reduction of the $1,750,000 punitive damage award is that the figure it chooses, $650,000, is ten times the amount of the reduced compensatory damages. But why is ten, aside from being a round number with metric significance, the proper multiplier? Would not eleven or nine be just as appropriate? And if "[t]here is no arbitrary rule that punitive damages cannot equal 15 times the compensatory damages," *Malco, Inc. v. Midwest Aluminum Sales, Inc.*, 14 Wis. 2d 57, 66, 109 N.W.2d 516, 521 (1961), why did not the majority award punitive damages of $975,000?

The use of a multiplier as the sole means to determine punitive damages has been specifically rejected. In *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 235-36, 291 N.W.2d 516, 527 (1980), the court said:

Although the amount of compensatory damages and criminal penalties have some relevancy to the amount of punitive damages and may be factors in determining the reasonableness of the punitive damages award, we have not been willing in the past, and are not willing in this case, to adopt a mathematical formula for awarding punitive damages. In punitive damages, as in damages for pain and suffering, the law furnishes no mechanical legal rule for their measurement. *The amount rests initially in the discretion of the jury. We are reluc-*

*tant to set aside an award because it is large or we would have awarded less. As we have said in cases involving compensatory damages, " '[A]ll that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience.' "*

(Emphasis added; quoted source omitted.)

The jury saw the witnesses and heard what HABCO did. I cannot conclude that a $1,750,000 punitive damage award against accountants who have stolen their client's software was an insane estimate by the jury. We give juries discretion in their award of punitive damages. I agree that the award is large and I would have awarded less. But that is not the test. We must look at whether "the jury approximates a sane estimate," *id.* at 236, 291 N.W.2d at 527, and, using that test, I would affirm the jury's punitive damage award. The message sent by the majority in a world where computers have provided extensive profits to those who can market the technology, is that crime pays, and pays well. The decision to risk $650,000 by stealing software can be an easy one where the profits can reach millions of dollars. Perhaps a $1,750,000 punitive damage award is not much better than a $650,000 award, but it is a start. It sends the message that courts will not reverse large punitive damage awards where the conduct is criminal and egregious. It allows for the possibility that even larger awards will be sustained when the conduct merits it. And that possibility will, perhaps, give potential computer thieves pause when they contemplate obtaining desired software by theft.

For these reasons, I respectfully dissent.