(90-CV-534) WISCONSIN HOUSING & ECONOMIC DEVELOP-
MENT AUTHORITY, Plaintiff-Respondent,

v.

BAY SHORE APARTMENTS, Defendant-Appellant,

Peter H. KNAUP, Defendant.

(90-CV-535) WISCONSIN HOUSING & ECONOMIC DEVELOP-
MENT AUTHORITY, Plaintiff-Respondent,

v.

FLAGSHIP, Defendant-Appellant,

Peter H. KNAUP, Defendant.

Court of Appeals

*No. 93–1825. Submitted on briefs June 8, 1994.—Decided
February 8, 1996.*

(Also reported in 546 N.W.2d 480.)

For the defendant-appellant the cause was submitted on the brief of *John A. Erich* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the brief of *Lawrence Bensky* and *Robert J. Dreps* of *La Follette & Sinykin* of Madison.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Bay Shore Apartments and Flagship are Wisconsin limited partnerships. They appeal from a declaratory judgment in favor of Wisconsin Housing & Economic Development Authority (WHEDA). Each partnership mortgaged real estate to WHEDA. The judgment declares that under ch. 234, STATS., and under the contracts between the parties, upon satisfaction of the mortgages, Bay Shore's and Flagship's "replacement reserve funds shall be disbursed first to the limited partnership to bring its cumulative return on equity to six percent (or any other amount permitted by ch. 234) and *then to WHEDA*, subject to any applicable rights of the United States Department of Housing and Urban Development." (Emphasis added.)

The judgment before us is based on the trial court's interpretation of the phrase "dissolution of the limited-profit entity" in § 234.07(1), STATS. That statute provides in pertinent part that upon the "dissolution of the limited-profit entity any surplus in excess of the distri-

butions allowed by this section shall be paid to the authority," WHEDA.[1]

If, as the trial court held, "dissolution of the limited-profit entity" means satisfaction of their mortgages to WHEDA, when that occurs Bay Shore and Flagship must pay their replacement reserves to WHEDA. But if the phrase means dissolution of the Bay Shore and Flagship partnerships, they need not pay their replacement reserves to WHEDA unless the partnerships themselves are dissolved while they are limited-profit entities. We conclude that the trial court correctly construed the phrase as it appears in § 234.07(1), STATS., and we therefore affirm.

## I. BACKGROUND

WHEDA initiated this action by bringing certain claims against the partnerships, and they in turn counterclaimed. The trial court dismissed WHEDA's claims after the parties reached a settlement and dismissed all of the counterclaims except one. The remaining counterclaim raised the replacement reserves issue. The partnerships and WHEDA brought cross motions for summary judgment on that counterclaim, and the trial court granted summary judgment for WHEDA.

Bay Shore owns a 112-unit apartment in Beaver Dam, Wisconsin. Flagship owns an apartment project with thirty-three units in Green Lake and thirty-seven units in Kewaskum, Wisconsin. Bay Shore and Flagship rent their projects to low and moderate income tenants and receive a federal rent subsidy under Section 8 of the United States Housing Act of 1937

---

[1] In ch. 234, STATS., "authority" means WHEDA. Section 234.01(1), STATS.

("Section 8") through the United States Department of Housing and Urban Development (HUD).

Bay Shore and Flagship each entered a housing assistance payments contract (HAP contract) with WHEDA, which HUD approved, under which HUD provides the Section 8 rent subsidy to each partnership. WHEDA administers the Section 8 rent subsidies.

Under the Section 8 program, HUD and the partnerships establish fair market rents for the units in the projects. The partnerships agree to rent their units to low and moderate income tenants and in return receive a Section 8 rent subsidy. The tenants pay up to thirty percent of their income toward the market rent, and the rent subsidy makes up the difference. Tenants pay their share of the rent to the partnerships, and HUD pays the rent subsidy to the partnerships. 42 U.S.C. § 1437, *et seq*. Each partnership deposits those payments in the bank account in its name. Out of these accounts the partnerships pay their expenses, make any required deposits to reserves and make permitted distributions to their partners.

Bay Shore and Flagship borrowed from WHEDA to develop their projects, and to secure their loans they gave WHEDA notes and mortgages on their projects. Each mortgage provides that the rights and obligations of WHEDA and each partnership shall at all times be in conformance with ch. 234, STATS.

The Bay Shore note bears interest at 7.53% and provides for equal monthly payments of principal and interest, the final payment being due September 1, 2009. The Flagship note bears interest at 13.41% and provides for equal monthly payments of principal and interest, the final payment being due April 1, 2012.

The Bay Shore and Flagship notes prohibit prepayment prior to the expiration of twenty years from the date of the first principal payment without the prior written approval of WHEDA. Thereafter, Bay Shore and Flagship may prepay, provided certain conditions are met. Expiration of the twenty-year period for Bay Shore will occur on October 1, 1999, and for Flagship on May 1, 2002.

Bay Shore and Flagship each entered a regulatory agreement with WHEDA. Each regulatory agreement provides that its terms continue only so long as the WHEDA note and mortgage are outstanding. Bay Shore's and Flagship's regulatory agreements require that all project revenue be deposited in a bank account in the name of the respective partnership. Each agreement provides for establishment of a replacement reserve. The partnerships must use the principal in the replacement reserve and income earned on the principal to pay for capital improvements and operating expenses. WHEDA must give its prior written approval to any expenditure. Unexpended income accumulates in the replacement reserve.

Bay Shore's and Flagship's regulatory agreements restrict distributions in any one year to six percent of WHEDA-approved initial equity in the project. The initial equity and the resulting maximum allowable distribution remain the same for the term of the loan. The agreements grant WHEDA the right to preapprove distributions in excess of such permitted six percent annual distribution.

Each regulatory agreement provides that the tenant rent payments and Section 8 rent subsidy not expended for debt service, operating expenses, replacement reserves or the permitted six percent annual distribution, are "residual receipts." Unless otherwise

135

directed by WHEDA, the partnerships must transfer residual receipts to their replacement reserves. Excess Section 8 rent subsidy builds up in the replacement reserves as residual receipts.

Bay Shore's and Flagship's regulatory agreements provide that their respective mortgages control in case they conflict with the regulatory agreement.

The Bay Shore First Amendment to its 1978 Limited Partnership Agreement provides that as long as Bay Shore is indebted to WHEDA, it shall conduct itself as a limited-profit entity as defined in § 234.01(8), STATS., and any distributions are subject to § 234.07, STATS. The Flagship amended and restated 1981 limited partnership agreement has the same provision. It is undisputed that WHEDA required these provisions as a condition to making its loans to Bay Shore and Flagship.

The Bay Shore partnership agreement provides that the partnership continues until December 31, 2028, about nineteen years beyond the due date of its final monthly loan payment to WHEDA. The Flagship partnership agreement provides that the partnership continues until December 31, 2030, about eighteen-and-one-half years beyond the due date of its final monthly loan payment to WHEDA.

Bay Shore and Flagship report tenant rent payments and the Section 8 rent subsidy as taxable income on their federal income tax returns. Bay Shore and Flagship fund their replacement reserves from such rent payments and subsidies. Thus, they pay income taxes on the amounts deposited in the reserves. Each partner must pay his or her distributive share of the interest income earned from the replacement reserves.

## II. STATUTES INVOLVED

Section 234.01(8), STATS., provides in pertinent part:

"Limited-profit entity" means any person or trust which, in its articles of incorporation or comparable documents of organization, or by written agreement with the authority, provides that:

(a) As a condition of acceptance of a loan or advance under this chapter, the limited-profit entity shall enter into an agreement with the authority providing for limitations of rents, profits, dividends and disposition of property or franchises;
. . .

Section 234.07, STATS., provides in pertinent part:

(1) Except as provided in sub. (2), a limited-profit entity which receives loans from the authority may not make distributions, other than from funds contributed to the limited-profit entity by stockholders, partners, members or holders of beneficial interest in the limited-profit entity, in any one year with respect to a project financed by the authority in excess of 6% of its equity in such project on a cumulative basis. The equity in a project shall consist of the difference between the amount of the mortgage loan and the total project cost . . . . Upon the dissolution of the limited-profit entity any surplus in excess of the distributions allowed by this section shall be paid to the authority. . . .

(2) If a limited-profit entity agrees to provide housing for low-income and moderate-income persons until the end of the maximum term of a mortgage that the limited-profit entity gives the authority, a limited-profit entity that receives a loan from the authority may not make distribu-

137

tions, other than from funds contributed to the limited-profit entity by stockholders, partners, members or holders of a beneficial interest in the limited-profit entity, in any one year with respect to a project financed by the authority in excess of 12% of its equity in the project on a cumulative basis.

## III. CONTENTIONS OF THE PARTIES

Bay Shore and Flagship contend that ch. 234, STATS., and the contracts between the parties require Bay Shore and Flagship to pay surplus to WHEDA only if they dissolve, as partnerships, while indebted to WHEDA, and therefore they need not pay their replacement reserves to WHEDA upon satisfaction of their notes and mortgages. They contend that the term "dissolution" as used in § 234.07, STATS., does not mean satisfaction of the WHEDA note and mortgage; requiring them to pay their replacement reserves to WHEDA upon termination of their status as limited-profit entities is contrary to the public purpose of ch. 234; and ch. 234 and their regulatory agreements limit distributions and not profits. Flagship contends that its regulatory agreement does not require it to give its replacement reserve to WHEDA upon satisfaction of its note and mortgage.

WHEDA contends that the legislature intended that WHEDA retain surplus funds generated by limited-profit entities for publicly subsidized housing projects, and that the language of § 234.07(1), STATS., is plainly addressed to dissolution of limited-profit entities, as statutorily defined, and does not mean dissolution of the partnerships themselves. It contends that the statute's manifest purpose is to make the surplus funds remaining upon mortgage satisfaction available to develop and preserve additional low and

138

moderate income housing, and that purpose requires that the funds be paid to WHEDA. WHEDA contends that the partnerships' interpretation of the statute contradicts their contractual agreements, that their policy arguments are speculative and unfounded, and that their interpretation of the statute would undermine the legislature's goal to discourage mortgage prepayment.

## IV. STANDARD OF REVIEW

The historical facts are undisputed. For that reason, the case before us involves only issues of law. Those issues require us to interpret the Wisconsin statutes, a review we make without deference to the trial court. *City of Wisconsin Dells v. Dells Fireworks, Inc.*, 197 Wis. 2d 1, 15, 539 N.W.2d 916, 921 (Ct. App. 1995).

Nor are we bound by WHEDA's conclusions regarding the meaning of the disputed phrase in § 234.07(1), STATS. The courts apply varying degrees of deference to an administrative agency's statutory interpretations. *Sauk County v. WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267, 270 (1991). If the agency's experience, technical competence and specialized knowledge aids the agency in its interpretation and application of the statute, the agency's view is entitled to "great weight." *Id.* If the agency's decision is "very nearly" one of first impression, we grant it "due weight." *Id.* at 413-14, 477 N.W.2d at 270. Finally, we review the agency's interpretation de novo, according it no weight if the case is one of first impression and the agency lacks special expertise or experience in determining the question presented. *Id.* at 414, 477 N.W.2d at 270-71.

WHEDA never before has had to determine the meaning of the disputed phrase "dissolution of a limited-profit entity." We are aware of no special expertise that WHEDA has in making that determination. We therefore decide the meaning of the phrase without deference to WHEDA's view.

## V. REVIEW LIMITED TO STATUTORY INTERPRETATION

It is undisputed that Bay Shore and Flagship are limited-profit entities, as defined in § 234.01(8), STATS. Bay Shore's limited partnership agreement, as amended, provides that as long as Bay Shore is indebted to WHEDA, it shall conduct itself as a limited-profit entity as defined in § 234.01(8), and any distributions are subject to § 234.07, STATS. The amended and restated limited partnership agreement under which Flagship operates has the same provision. WHEDA required those provisions as a condition of making its loans to Bay Shore and Flagship.

Because Bay Shore and Flagship are limited-profit entities and because they have received loans from WHEDA, the only question before us is the meaning of the provision in § 234.07(1), STATS., "Upon the dissolution of the limited-profit entity any surplus in excess of the distributions allowed by this section shall be paid to the authority." We construe that provision, and not the documents or agreements between the parties. The statute controls, and it controls absolutely.

The statute, § 234.07(1), STATS., controls absolutely because it speaks in mandatory terms. It declares that a limited-profit entity which receives loans from the authority "may not" make distributions in excess of six percent of its equity. It provides that the equity in a project "shall" consist of the difference

between the mortgage loan and the project cost. It provides that the total project cost "shall" include certain items. It provides that with respect to every project the authority "shall . . . establish the entity's equity at the time of making of the final mortgage advance and . . . that figure shall remain constant during the life of the authority's loan with respect to such project." After providing that upon dissolution of the limited-profit entity any surplus in excess of the distributions allowed by § 234.07(1) "shall be paid to the authority," it provides that surplus "shall not" be deemed to include an increase in net worth.

The word "shall" is presumed mandatory when it appears in a statute. *Karow v. Milwaukee County Civil Serv. Comm.*, 82 Wis. 2d 565, 570, 263 N.W.2d 214, 217 (1978). While under certain circumstances we may construe "shall" as directory if necessary to carry out the legislature's intent, *id.* at 571, 263 N.W.2d at 217, no room exists in this statute for such a reading. Section 234.07(1), STATS., is inflexible in its commands.

Because the language of § 234.07(1), STATS., is mandatory and obligatory on a limited-profit entity as well as on WHEDA, "the statutory provisions step in and control and regulate the mutual rights and obligations rather than the provisions of any contract the parties may attempt to make varying therefrom." *Williams v. Travelers Ins. Co.*, 168 Wis. 456, 462, 169 N.W. 609, 610-11 (1919). We therefore look to the statute to determine the rights and duties of the parties, not to the documents or agreements between them.[2]

---

[2] *See also, e.g., Jones v. Preferred Accident Ins. Co.*, 226 Wis. 423, 426, 275 N.W. 897, 898 (1938); *Von Uhl v. Trempealeau County Mut. Ins. Co.*, 33 Wis. 2d 32, 38, 146 N.W.2d 516, 520

## VI.   INTERPRETATION OF § 234.07(1), STATS.

We are to avoid absurd or unreasonable readings of a statute. *Walag v. Town of Bloomfield*, 171 Wis. 2d 659, 663, 492 N.W.2d 342, 344 (Ct. App. 1992). We reject as absurd the argument that the phrase in § 234.07(1), STATS., "dissolution of the limited-profit entity" means dissolution of the type of organization under which the entity chose to do business.

Nothing in ch. 234, STATS., restricts WHEDA to doing business with any particular form of business organization. As far as ch. 234 is concerned, when WHEDA does business with a "limited-profit entity" that entity may choose any form of organization, ranging from a sole proprietorship through general or limited partnerships and corporations. A corporation organized under ch. 180, STATS., has "perpetual duration," unless its articles of incorporation provide otherwise. Section 180.0302, STATS. In theory, a ch. 180 corporation might never be dissolved. A partnership can be dissolved wholly on the happening of a fortuitous event. On application by or for a partner, a court shall decree dissolution whenever a partner has been declared "a lunatic in any judicial proceeding or is shown to be of unsound mind" or has become in any way "incapable of performing the partner's part of the

(1966). *See also Goossen v. Estate of Standaert*, 189 Wis. 2d 237, 248, 525 N.W.2d 314, 319 (Ct. App. 1994), *quoting Gordie Boucher Lincoln-Mercury of Madison v. J&H Landfill*, 172 Wis. 2d 333, 340, 493 N.W.2d 375, 378 (Ct. App. 1992) ("Where the state's public policy is expressed in legislative acts, 'the statutory provisions step in and control and regulate the mutual rights and obligations of the parties to a contract relating to the subject matter of the statute.' ").

partnership contract" or has been "guilty of such conduct as tends to affect prejudicially the carrying on of the business." Section 178.27(1)(a), (b) and (c), STATS. It is absurd to suppose that a provision so important as that in § 234.07(1), STATS., regarding payment of surplus in excess of allowable distributions to WHEDA would turn on the form of organization the limited-profit entity chose.

Since the term "limited-profit entity" has meaning only with reference to WHEDA's loan to it, the legislature must intend that the life of the entity terminates when the loan is satisfied and nothing remains to be done except to dispose of what is left in the hands of the entity, the "surplus in excess of the distribution allowed by" § 234.07(1). Disposal of that surplus is plainly controlled—it must be paid to the authority, WHEDA. "Dissolution of a limited-profit entity" therefore must mean, as the trial court concluded, that the legislature intended to give "dissolution" of the entity its common dictionary meaning of "coming to an end," and that "dissolution of the limited-profit entity" occurs upon satisfaction of the mortgage the entity has given to WHEDA.[3]

We reject for another reason the contention that "dissolution of a limited-profit entity," means dissolution of the form of organization in which the entity chose to do business. Section 234.07(1), STATS., severely restricts the "distributions" the entity may make "in

---

[3] Section 990.01(1), STATS., requires "technical words and phrases and others having a peculiar meaning in the law" to be construed according to such meaning. An exception exists when the construction "would produce a result inconsistent with the manifest intent of the legislature." Section 990.01. We conclude the exception applies here.

any one year with respect to a project financed by the authority." The entity is prohibited from making "distributions, other than from funds contributed to the limited-profit entity by stockholders, partners, members or holders of beneficial interest in the limited-profit entity . . . in excess of 6% of its equity in such project on a cumulative basis." The restriction allows no exceptions. Except for the requirement that upon dissolution "any surplus in excess of the distributions allowed by this section shall be paid to" WHEDA, such surpluses could be paid to entities, stockholders, partners and the like.

To allow the limited-profit entity to retain the surplus after satisfying a mortgage to WHEDA would result in the entity's having exceeded the statutory six-percent ceiling on distributions. The first sentence in § 234.07(1), STATS., provides that a "limited-profit entity which receives loans from the authority may not make *distributions* . . . in any one year with respect to a project financed by the authority in excess of 6% of its equity in such project on a cumulative basis."[4] (Emphasis added.) Because the only funds exempt from that limitation on distributions are "funds contributed to the limited-profit entity by stockholders, partners, members or holders of beneficial interest in the limited-profit entity," a prohibited distribution could occur unless the surplus at issue were paid to the authority, WHEDA. Nothing in ch. 234, STATS., requires the lim-

---

[4] Section 234.07(2), STATS., contains an exception, allowing a maximum of twelve percent of its equity in a project on a cumulative basis if the entity agrees to provide housing for low income and moderate income persons until the end of the maximum term of the mortgage that it gave to the authority. The exception has not been shown to apply to Bay Shore or Flagship.

144

ited-profit entity, after it has satisfied its mortgage to the authorities, to retain the surplus.

Our construction of § 234.07(1), STATS., furthers the purpose of ch. 234, STATS. When it created ch. 234, the legislature declared in part that

> in establishing Wisconsin housing finance author-
> ity, the legislature is acting in all respects for the
> benefit of the people of this state to serve a public
> purpose in improving and otherwise promoting
> their health, welfare and prosperity and that the
> Wisconsin housing finance authority, as created by
> this act, is empowered to act on the behalf of the
> people of this state in serving this public purpose for
> the benefit of the general public.

Section 1(8), ch. 287, Laws of 1971.

WHEDA must use the funds it receives for public purposes.

> The power delegated to the Authority by ch. 234,
> STATS., authorizes the Authority to act in such a way
> as will assist in the development and construction of
> housing for low and moderate income families and
> persons and in the elimination of substandard hous-
> ing conditions in the state of Wisconsin. The
> legislature has declared that there shall be a law
> and has determined the general policy sought to be
> achieved. The Authority must act within the limits
> as expressed by the purpose of ch. 234.

*State ex rel. Warren v. Nusbaum*, 59 Wis. 2d 391, 441, 208 N.W.2d 780, 809-10 (1973).

Those public purposes can be thwarted if upon satisfaction of a mortgage to WHEDA, a limited-profit entity may retain and ultimately distribute as profit the surplus funds generated during the life of the mort-

145

gage. Such an entity would not be required to implement the public purposes of ch. 234, STATS.

However, Bay Shore and Flagship contend that requiring them "to forfeit their replacement reserves" would frustrate the purpose and contravene the public policy behind ch. 234, STATS. They claim that to require they repay their surpluses to WHEDA will discourage development and maintenance of decent, safe and sanitary low income housing because WHEDA will have no incentive to release funds from the replacement reserves for needed expenditures. They assert that WHEDA will withhold its consent to maximize the amount accumulated in the reserves in order to maximize the amount subject to WHEDA's "confiscation." The answer, of course, is that the statute provides that upon dissolution of the limited-profit entity, any surplus or excess of distributions is to be paid to WHEDA. Bay Shore and Flagship should make their public policy arguments to the legislature and not the courts.

Bay Shore and Flagship assert that allowing WHEDA to take their replacement reserves will discourage low income housing project owners from operating and managing their projects prudently. That cannot be true, since project owners continue to own the projects after the limited-profit entity has been dissolved, and during the life of each entity the reserves are available to the project owners for maintenance. The argument that maintenance of low income housing will be jeopardized because project owners will have little incentive to advance their own funds for maintenance makes no sense. During the life of the mortgage the project owners have every incentive to use the accumulated surplus for that very purpose, because they will continue to own the projects after their mortgages to WHEDA are satisfied.

The partnerships also attack WHEDA's reading of § 234.07(1), STATS., because they say it will deprive the low income and moderate income tenants of the rent subsidy HUD sets aside for the tenants' benefit. HUD, the argument continues, allocated federal funds to help low and moderate income people obtain decent, safe and sanitary housing, and the Section 8 subsidy is sup-. posed to benefit those people in those projects, and not WHEDA. They say that unexpended funds in the replacement reserves should remain with the partnerships to benefit their tenants. They contend the tenants will be benefited because the partnerships "could" invest the funds and "could" use the principal and earnings to subsidize the tenant rents after the thirty-year term, and the partnerships "could" use the funds to make capital improvements or project enhancements since the projects will be thirty years old at that point and will likely need such expenditures. They assert they "could" hold the funds in reserve and avoid having to borrow funds in the future, and to the extent that they do not borrow and pay interest they will be better able to keep their rents affordable.

It is true that each "could" is a possibility. It is also true, however, that the partnerships "could" refuse to subsidize tenant rents. They "could" refuse to use the funds to make capital improvements or enhancements. They "could" spend the funds and borrow in the future. Which set of "coulds" should apply is not for us to determine. The legislature decreed that upon dissolution of the limited-profit entity, the surpluses we have been discussing "shall be paid to the authority," WHEDA.

That equity investors will be reluctant to invest in low income housing because of possible adverse income tax consequences is a just concern, but, as WHEDA points out, how the taxing authorities treat the reserve

funds at issue has nothing to do with determining the legislature's intent as to the disposition upon mortgage satisfaction.[5]

Bay Shore and Flagship assert that allowing WHEDA to take their replacement reserves will violate the "compacts" WHEDA made with them at the outset of these developments. However, each compact, so far as pertinent to this appeal, is that, as provided in § 234.07(1), STATS., upon dissolution of Bay Shore and Flagship as limited-profit entities, any surplus in excess of the distributions allowed by that section must be paid to WHEDA. WHEDA does not violate the compact when it insists that the partnerships perform as statutorily required.

---

[5] Bay Shore and Flagship refer to this as a so-called the "Phantom Income" problem. They assert that the partners must report the amounts deposited in the replacement reserves and the income earned on such reserves as taxable income since HUD and the tenants paid these revenues to the partnerships and the partnerships own the revenue, but WHEDA will not allow them to receive those funds. They assert that the investors' income problem becomes more acute every year because of reportable taxable income increases as tenant payments in Section (8) subsidy increase and depreciation and interest deductions decrease, yet they never receive more than the permitted percentage annual distribution. WHEDA replies that the partnerships have the cart before the horse, that ownership determines taxation, not vice versa. *See generally United States v. Maryland Jockey Club of Baltimore County*, 210 F.2d 367 (4th Cir. 1954) (funds spent from reserve account under state control prior to reversion to state belong to owner and are taxable); *Stendig v. United States*, 843 F.2d 163 (4th Cir. 1988) (funds placed in reserve account under state control but which revert to owners are taxable). We cannot resolve the tax issue. Section 234.07(1), STATS., controls regardless of the tax consequences.

The partnerships contend that allowing WHEDA to take their replacement reserves in effect makes WHEDA their partner when it is only a lender and will give WHEDA a windfall to which it is not entitled. The plain fact is that WHEDA is a lender and not a partner. To suggest that the surplus referred to in § 234.07(1), STATS., is a windfall to which WHEDA is not entitled is to impugn the statute under which the partnerships agreed to operate when they borrowed from WHEDA. WHEDA is entitled to the reserves because the legislature has said so. The "windfall" argument has no merit.

Bay Shore and Flagship next contend that ch. 234, STATS., and the regulatory agreements limit distributions but not profits. They assert that neither ch. 234 nor the regulatory agreements restrict or prohibit the partnerships from generating profits in excess of the committed six percent annual distribution. Section 234.07(1), STATS., they argue, merely prohibits making distributions in excess of the permitted six percent without WHEDA's approval. Meanwhile, residual receipts in replacement reserves accumulate in the replacement reserves, and when the partnership satisfies its note and mortgage, the prohibition terminates. We reject the contention. Section 234.07(1) provides that upon dissolution the surplus in excess of distributions allowed by that statute must be paid to the authority, and the statute prohibits "distributions" in excess of six percent of an entity's equity in the project. And, as we have said, the same provision requires that "upon" dissolution, payment must be made.

Although Flagship's regulatory agreement requires its replacement reserve to be disbursed to WHEDA upon satisfaction of its note and mortgage, Flagship contends that the provision is "ineffective" to require Flagship to pay its replacement reserve to

WHEDA because it is said to conflict with § 234.07, STATS., which in Flagship's view, "requires payment of surplus to WHEDA only if the *borrower* dissolves and at the time of dissolution is a limited-profit entity." (Emphasis added.) We have rejected the same proposition with regard to § 234.07 several times throughout this opinion. The statute, as properly construed, does not conflict with regulatory agreement. Finally, Flagship asserts that the Bay Shore regulatory agreement, drawn and entered into by WHEDA years before the Flagship regulatory agreement, does not contain the same provision. It then asserts that this somehow evinces WHEDA's original intent and the intent of the legislature that § 234.07, and not the terms of the regulatory agreement which terminates when the borrower repays the underlying loan, is to govern payment of surplus to WHEDA. We repeat—§ 234.07 prevails. That statute requires payment upon dissolution of the limited-profit entity, and dissolution occurs when the mortgage to WHEDA is satisfied.

## VII. CONCLUSION

Because we conclude that the circuit court correctly declared that Bay Shore and Flagship must pay their replacement reserves to WHEDA at the time of satisfying their respective mortgages to WHEDA, we affirm the judgment.

*By the Court.*—Judgment affirmed.

SUNDBY, J. (*dissenting*). The majority reaches a result which makes eminent good sense, but requires that we judicially amend § 234.07(1), STATS., to read: "*Upon satisfaction of the authority's loan with respect to*

*a project,* any surplus in excess of the distributions allowed by this section shall be paid to the authority [WHEDA]." (Emphasized language added.) Unfortunately, however, the statute reads: *"Upon the dissolution of the limited-profit entity*[,] any surplus in excess of the distributions allowed by this section shall be paid to the authority." (Emphasis added.) When the life of the authority's loan with respect to a project ends, the limited-profit entity is not thereupon dissolved. A limited-profit entity may have dozens of loans with WHEDA. The legislature may have contemplated that any surplus in excess of the distributions allowed by § 234.07(1) could be used by the limited-profit entity to provide additional low and moderate income housing, but once the limited-profit entity dissolves, any reserve or reserves revert to WHEDA.

The majority's construction of "dissolution of the limited-profit entity" requires that there be a separate limited-profit entity for each loan and agreement made with WHEDA. I submit that the definition of "limited-profit entity" does not permit that peculiar result.

Section 234.01(8), STATS., defines "limited-profit entity" as follows:

> "Limited-profit entity" means any person or trust which, in its articles of incorporation or comparable documents of organization, or by written agreement with the authority, provides that:
>
> (a)   As a condition of acceptance of a loan or advance under this chapter, the limited-profit entity shall enter into an agreement with the authority providing for limitations of rents, profits, dividends and disposition of property or franchises
> . . . .

Note that para. (a) speaks of "a" loan not "the" loan.

Thus, in its documents of organization, the "limited-profit entity" must provide that as a condition of *any* loan or advance made by WHEDA, it shall enter into an agreement with the authority in which it agrees to limit its rents, its profits, its dividends, and agrees to the disposition of any property or franchise subject to such an agreement. I see no reason why a limited-profit entity may not enter into numerous loan and operational agreements with WHEDA without creating a separate limited-profit entity for each project and each loan or operational agreement.

Clearly, however, the members of a limited-profit entity may never realize more equity than the entity had at the time the authority made the final mortgage advance with respect to any project. Section 234.07(1), STATS., provides in part:

> With respect to every project the authority shall, pursuant to rules adopted by it, establish the entity's equity at the time of making of the final mortgage advance and, for purposes of this section, that figure shall remain constant during the life of the authority's loan with respect to such project.

Plainly, the limited-profit entity's equity does not increase after the life of the authority's loan with respect to a project has expired. That does not mean, however, that any surplus in excess of that equity must thereupon revert to WHEDA. The legislature has said that any such surplus shall revert to WHEDA "[u]pon the dissolution of the limited-profit entity."

We have been cautioned that in the absence of ambiguity in a statute, only the plain meaning of words in the normal sense, as used in the context of the statute, can be looked to. *Girouard v. Jackson Circuit Ct.*, 155 Wis. 2d 148, 156, 454 N.W.2d 792, 795-96 (1990).

"Resort to definitions, statutory or dictionary, is appropriate for the purpose of determining meaning that is plain on the face of the statute. It is not necessary or appropriate to find ambiguity before looking to word definitions." *Id.* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 570 (2d ed. 1987), defines "dissolution" as follows: "[L]egal termination, esp. of business activity, with the final distribution of assets, the fixing of liabilities, etc." The satisfaction of a limited-profit entity's mortgage obligation to WHEDA does not dissolve the entity—there is no sale of the project's assets, settlement of liabilities, and other consequences which accompany the dissolution of a corporation or partnership.

How then is the public purpose of limiting profits of a limited-profit entity to be ensured? I find the answer in the definition of "limited-profit entity." Section 234.01(8)(b), STATS., provides in part:

> If the limited-profit entity receives a loan or advance under this chapter, the chairperson of the authority, acting with the prior approval of the majority of members of the authority, may, if he or she determines . . . that the limited-profit entity is . . . not carrying out the intent and purposes of this chapter, appoint to the board of directors or other comparable controlling body of such limited-profit entity a number of new directors or persons, which number shall be sufficient to constitute a voting majority of such board or controlling body . . . .

I believe WHEDA continues to have this authority to assume control of a limited-profit entity, even after its agreement with the entity expires, because the entity's use of any surplus or replacement reserve for purposes not consonant with ch. 234, STATS., would not carry out the intent and purposes of the chapter. I

realize my reconciliation of the statutes may not be entirely satisfactory because it keeps WHEDA in a "watch-dog" position after a mortgage has been retired and its agreement with an entity has expired; however, my construction does not require that we engage in judicial amendment of the statutes.

For these reasons I respectfully dissent.