MESSNER MANOR ASSOCIATES, a Wisconsin Limited Partnership, James P. Messner, General Partner and Limited Partner, Laura Lynn Messner and Deborah Jean Loeber, Limited Partners, Plaintiffs-Appellants,†

v.

WISCONSIN HOUSING & ECONOMIC DEVELOPMENT AUTHORITY, Defendant-Respondent.

Court of Appeals

*No. 95–2642. Submitted on briefs May 29, 1996.—Decided September 18, 1996.*

(Also reported in 555 N.W.2d 156.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Glen B. Kulkoski* of *Carr, Kulkoski & Stuller, S.C.* of New Berlin.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Lawrence Bensky* and *Timothy F. Nixon* of *LaFollette & Sinykin* of Madison.

Before Anderson, P.J., Brown and Snyder, JJ.

ANDERSON, P.J.   Messner Manor Associates appeals from a summary judgment dismissing all twelve of its claims against the Wisconsin Housing and Economic Development Authority (WHEDA). On appeal, Messner Manor argues that the trial court erred in dismissing three of its claims.[1] We disagree, and therefore, we affirm.

The essential facts are undisputed. Messner Manor owns and operates an eighty-unit housing project in Menomonee Falls, Wisconsin, subsidized through the United States Department of Housing and Urban Development (HUD) housing assistance payments program as set forth in Section 8 of the United States Housing Act of 1937, *as amended*, 42 U.S.C.A. § 1437, et seq. (1994), and the regulations promulgated thereunder. Messner Manor entered a

---

[1] Although Messner Manor appealed the trial court's judgment, only three claims are addressed in its brief-in-chief. The three claims are as follows: Claim 8, Messner Manor alleges that WHEDA has charged a mortgage note interest rate in excess of the figure agreed upon by the parties; Claim 9, Messner Manor claims that its equity was improperly determined and that it should be recalculated to include subsequent expenses; and Claim 10, Messner Manor maintains that it is entitled to receive the interest generated from its property tax and insurance escrow accounts, which are administered by WHEDA.

housing assistance payment contract with WHEDA, which HUD approved, under which HUD provides the Section 8 rent subsidy to the partnership. WHEDA administers the Section 8 rent subsidies.[2]

Messner Manor was constructed between 1977 and 1978. Upon completion in September 1978, the construction financing was replaced with permanent financing, through WHEDA, as a forty-year note and mortgage totaling $1,625,356. Messner Manor also agreed to the terms of a regulatory agreement, a pledge agreement and a housing assistance payment contract. These contract documents generally set forth the rules, regulations and terms for the operation of Messner Manor as a qualified Section 8 housing project.

On May 24, 1990, Messner Manor initiated this action against WHEDA. WHEDA denied the allegations, moved for dismissal and counterclaimed against Messner Manor. In March 1991, WHEDA moved for partial summary judgment on eight of the twelve claims on the pleadings. The trial court granted the motion in part, dismissing four claims.

In August 1993, WHEDA again moved for summary judgment on Messner Manor's remaining eight claims.[3] Messner Manor withdrew four of its

---

[2] Under the Section 8 program, HUD and the partnership establish fair market rents for the units in the project. The partnership agrees to rent to low and moderate income tenants in return for a Section 8 rent subsidy. The tenants pay up to thirty percent of their income to the partnership for the market rent. HUD also pays the rent subsidy to the partnership. *WHEDA v. Bay Shore Apartments*, 200 Wis. 2d 129, 134, 546 N.W.2d 480, 482 (Ct. App. 1996); 42 U.S.C.A. § 1437, et seq. (1994).

[3] In July 1992, Northbrook Property and Casualty Insurance Company (Northbrook) requested intervention in

claims during negotiations. Subsequently, on August 11, 1995, the trial court granted WHEDA's motion as to the remaining four claims; dismissed three of WHEDA's counterclaims; and granted WHEDA's motion for summary judgment on its remaining counterclaim for attorney's fees. Messner Manor appeals. Other facts will be incorporated into the opinion as necessary.

Messner Manor argues that the trial court erred by granting WHEDA's motions for summary judgment. We review a motion for summary judgment using the same methodology as the trial court. *M & I First Nat'l Bank v. Episcopal Homes*, 195 Wis. 2d 485, 496, 536 N.W.2d 175, 182 (Ct. App. 1995); § 802.08(2), STATS. That methodology is well known, and we will not repeat it here except to observe that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See M & I First Nat'l Bank*, 195 Wis. 2d at 496-97, 536 N.W.2d at 182; *see also* § 802.08(2). As the material facts are not contested, only issues of law remain to be determined.

## EXCESSIVE INTEREST

Messner Manor alleges that WHEDA has breached their agreement by charging a mortgage note interest rate in excess of the figure directed by the terms of the note itself. Messner Manor points to the

this action to determine whether a policy issued by Northbrook to WHEDA from February 1990 to February 1991 would require Northbrook to provide coverage to WHEDA for injuries alleged in Messner Manor's third claim for relief. The trial court found that Northbrook did not have a duty to defend or indemnify WHEDA on Messner Manor's third claim, thereby dismissing Northbrook.

original bond yield underlying the mortgage which had an annual percentage rate of 6.379%, but contends that this figure was incorrectly adjusted to 6.75% at the closing.

The note states that the "annual percentage rate shall be the rate shown on the schedule attached to this Mortgage Note . . . referred to as 'Schedule I.' " It further states that the interest shall be equal to the effective interest cost WHEDA is required to pay on the notes or bonds issued to make the mortgage. The annual percentage rate on Schedule I, dated July 11, 1977, was 7.5%. This construction rate was in effect for twelve months after the initial closing date, which was July 18, 1977.

The construction loan rate was adjusted in the permanent financing to 6.75%, as evidenced in the first amendment to Schedule I to the mortgage note. This occurred prior to the date of the closing in September 1978. At the closing, Messner Manor also received an amortization schedule with the 6.75% figure, along with the other closing documents.

The parties agree that § 893.43, STATS., is applicable to this issue. Section 893.43 provides that "[a]n action upon any contract . . . shall be commenced within 6 years after the cause of action accrues or be barred." The alleged breach, the incorrect adjustment of the percentage rate, occurred in September 1978. The suit was filed in May 1990, well beyond the six-year statute of limitations. Nevertheless, Messner Manor contends that each month after May 1984 that it made payments at the higher interest rate constituted breaches and those payments should not be time barred.

We, however, are not persuaded that the adjustment of the annual percentage rate, incorrect or not, constituted a breach. In Wisconsin:

> a 90-year line of precedent holds that in an action for breach of contract, the cause of action accrues and the statute of limitations begins to run from the moment the breach occurs. This is true whether or not the facts of the breach are known by the party having the right to the action.

*CLL Assocs. v. Arrowhead Pac. Corp.*, 174 Wis. 2d 604, 609, 497 N.W.2d 115, 117 (1993) (quoted source omitted). In addition, a contract is enforceable if it expresses the essential commitments and obligations of each party with reasonable certainty. *Management Computer Servs. v. Hawkins*, 196 Wis. 2d 578, 594, 539 N.W.2d 111, 118 (Ct. App. 1995). The minds of the parties must meet on essential terms. *Id.* at 594-95, 539 N.W.2d at 118.

Here, the deposition testimony of James Messner evinces the meeting of the parties' minds as to the annual percentage figure. Messner had the following colloquy:

Q: The interest rate on the permanent financing, do you recall what that was?
A: Six and three-quarters.

. . . .

Q: Schedule I and that has an interest rate in there?
A: Of 7.5.
Q: Right.
A: That was readjusted to six and three-quarters.
Q: And do you recall when that was readjusted?

A:  It was readjusted before the date of the closing, because on the date of closing we got an amortization schedule at six and three-quarters.

. . . .

Q:  Let me show what's been marked as Exhibit 3. Is that what you got on the day of closing, that Schedule I to the mortgage note?

A:  Right, either on the day of closing or right there, but that's what we got with a copy of the amortization schedule.

Q:  And is that your signature on Exhibit 3?

A:  Right.

Q:  And were you as far as your understanding when you signed this, were you agreeing to pay interest of six and three-quarter percent?

A:  Um-hum, yes.

Q:  Did you protest at the time the six and three-quarter percent?

A:  I had no reason to at the time that I know of.

Q:  Did you tell them that you thought that it was an illegal interest rate?

A:  No.

Q:  Did you at some point come to the conclusion that it was illegal?

A:  I wouldn't say it was illegal. I questioned it later, much later on.

■

The evidence establishes that both parties understood the mortgage rate to be 6.75% and not some lower figure. Indeed, both parties acted in accordance with the terms of the contract, even after the difference in terms was discovered. Clearly, there was a meeting of the minds on the essential terms of the contract, including the mortgage rate. This is true even though Messner Manor was unaware that the figure was

incorrect at the September 1978 closing. We conclude that the parties agreed to the 6.75% figure, whether or not it was calculated correctly, and that payments of the note at that rate did not constitute breaches of the agreement. Accordingly, Messner Manor's claim for excessive interest rate is time barred.

Messner Manor also cites *Jensen v. Janesville Sand & Gravel Co.*, 141 Wis. 2d 521, 415 N.W.2d 559 (Ct. App. 1987), in support of its "continuous" breach argument. *Jensen* is inapposite. *Jensen* involved an alleged breach of a pension plan which entailed periodic payments. *Id.* at 526-27, 415 N.W.2d at 561. The issue before the court was whether the company repudiated its contract by ceasing Jensen's pension payments and whether the failure to make each payment was a separate breach. *Id.* at 527-28, 415 N.W.2d at 561-62. In contrast, Messner Manor, which is the promisor, has made all of its payments based upon the percentage rate fixed in September 1978. This situation does not involve a repudiation or a breach of the agreement and the two cannot be reconciled.

### EQUITY CALCULATION

Messner Manor further argues that § 234.07, STATS., does not bar WHEDA from recalculating its original equity to include, at a minimum, $29,151.67 in additional construction costs which resulted from a lawsuit involving the general contractor. Messner Manor maintains that it "is not seeking to skirt the statute . . . but rather is claiming certain items should have been included at the time the determination was made." This argument ignores the clear import and mandatory terms of the statute.

Section 234.07(1), STATS., provides in pertinent part: "[T]he authority *shall*, . . . establish the entity's

equity at the time of making the final mortgage advance and, . . . that figure *shall* remain constant during the life of the authority's loan with respect to such project." (Emphasis added.) The word "shall" is presumed mandatory when it appears in a statute. *WHEDA v. Bay Shore Apartments*, 200 Wis. 2d 129, 141, 546 N.W.2d 480, 485 (Ct. App. 1996). While under certain circumstances we may construe "shall" as directory if necessary to carry out the legislature's intent, no room exists in this statute for such a reading. Section 234.07(1) is inflexible in its commands. *Bay Shore Apartments*, 200 Wis. 2d at 141, 546 N.W.2d at 485.

The language of § 234.07, STATS., is mandatory and obligatory on a limited-profit entity[4] as well as on WHEDA; the statutory provisions step in and control and regulate the mutual rights and obligations rather than the provisions of any contract the parties may attempt to make varying therefrom. *Bay Shore Apartments*, 200 Wis. 2d at 141, 546 N.W.2d at 485. Therefore, we must look to the statute to determine the rights and duties of the parties. *Id.*

We are to avoid absurd or unreasonable readings of a statute. *Id.* at 142, 546 N.W.2d at 485. Messner Manor's argument that the phrases in § 234.07(1), STATS., "the entity's equity . . . shall remain constant

---

[4] Section 234.01(8), STATS., provides in pertinent part:

"Limited-profit entity" means any person or trust which, . . . by written agreement with the authority, provides that:

(a) As a condition of acceptance of a loan or advance under this chapter, the limited-profit entity shall enter into an agreement with the authority providing for limitations of rents, profits, dividends and disposition of property or franchises; . . . .

It is not disputed that Messner Manor is a limited-profit entity, as defined in § 234.01(8).

during the life of the authority's loan" allows for the correction of errors, whether they should have been included in the original determination or came into existence years later, is unreasonable and absurd. The statute provides that the equity in a project "shall" consist of the difference between the mortgage loan and the project cost. It provides that the total project cost "shall" include certain items, including construction costs, and that the equity figure "shall" be established by the final mortgage advance. *See* § 234.07(1).

The statute is clear. It does not permit the mortgagor to knock on WHEDA's door each time it incurs additional expenses. Instead, an owner is required to gather all of its known or anticipated costs *at the time of the closing*. We conclude that § 234.07, STATS., read as a whole, is clear and unambiguous—the parties are responsible for determining the equity at the closing and recalculation is explicitly prohibited.

### INTEREST ESCROWS

Lastly, Messner Manor maintains that it is entitled to receive the interest which has been generated from its property tax and insurance escrow accounts which are administered by WHEDA. Messner Manor argues that there must be an explicit grant of authority for WHEDA to keep the interest earned on escrow payments made by Messner Manor.

As recognized by our supreme court, the legislature has granted WHEDA all the powers "necessary or convenient" to implement its public purpose. *State ex rel. Warren v. Nusbaum*, 59 Wis. 2d 391, 424, 208 N.W.2d 780, 801 (1973). For example, WHEDA's powers include, but are not limited to, making and executing contracts; acquiring and

disposing of mortgages or security interests; acquiring leaseholds, real or personal property or any interest therein; and under certain conditions, owning, holding, clearing, improving and rehabilitating, and selling, assigning, exchanging, transferring, conveying, leasing, mortgaging or otherwise disposing of or encumbering the same. *Id.* In addition, WHEDA's debts are satisfied out of rents and interest it receives from the property it acquires and the investments it makes. *Id.*

Further, Messner Manor's contention again ignores the clear import of § 234.07(1), STATS. The statute declares that a limited-profit entity which receives loans from the authority "may not" make distributions, other than from funds contributed to the limited-profit entity by stockholders, partners, members or holders of a beneficial interest in the limited-profit entity, in excess of 6% of its equity on a cumulative basis.[5] *Id.* The restriction allows no exceptions. Even upon dissolution, any surplus or excess of distributions must be paid to WHEDA and not returned to the limited-profit entity. *See Bay Shore Apartments*, 200 Wis. 2d at 144-45, 546 N.W.2d at 486-87. We conclude that § 234.07(1) does not allow for the distribution of interest from the escrow funds in excess of 6% of a limited-profit entity's equity on a cumulative basis.

---

[5] Messner Manor concedes this much in its complaint wherein it states: "Specifically, the plaintiff James P. Messner is limited to 6% of his initial capital investment in the project. The figure calculates at $10,836 per year, and this is the only money he actually has received, and does receive, or ever is to receive during the term of the mortgage."

Our conclusion is supported by the regulatory agreement.[6] Provision 6 (c), Development Cost Escrow Fund, requires:

> [t]he interest earned on the Development Cost Escrow Fund shall be used, first, to bring return on equity up to the permitted return of six percent (6%) to the extent said return on equity is not earned from operations, and, thereafter, to provide social services incidental to the Development and, subject to the approval of [WHEDA], to provide for other purposes benefiting the Development as proposed from time to time by Mortgagor. . . . The Development Cost Escrow Fund shall remain in existence for the entire period during which [WHEDA] is the Mortgagee of the Development.

This provision does not allow Messner Manor to receive a credit or disbursement for the interest earned beyond the statutory 6% disbursement in compliance with § 234.07(1), STATS. Clearly, any additional interest is to be used for improvements with the Development during the terms of the mortgage. Thereafter, the surplus is to be paid to WHEDA. *See* § 234.07(1); *Bay Shore Apartments*, 200 Wis. 2d at 144-45, 546 N.W.2d at 486-87.

*By the Court.*—Judgment affirmed.

---

[6] When a statute, such as § 234.07(1), STATS., speaks in mandatory terms, we construe the statute, not the documents or agreements between the parties. The statute controls absolutely. *Bay Shore Apartments,* 200 Wis. 2d at 140, 546 N.W.2d at 485.