**WESTOWNE SHOES, INC. and Carl A. Biwer Co., Plaintiffs–Appellants,**

v.

**BROWN GROUP, INC., et al., Defendants–Appellees.**

No. 96–1955.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1996.

Decided Jan. 17, 1997.

George P. Kersten (argued), Kenan J. Kersten, Kersten & McKinnon, Milwaukee, WI, for plaintiffs–appellants.

Ronald M. Wawrzyn (argued), Walter E. Zimmerman, Bryan B. House, Foley & Lard-

ner, Milwaukee, WI, for defendants–appellees.

Before POSNER, Chief Judge, and FLAUM and EVANS, Circuit Judges.

POSNER, Chief Judge.

In this diversity suit based on Wisconsin law, affiliated firms, now defunct, that owned retail shoe stores in Wisconsin and that we shall refer to collectively as "Westowne" fired a blunderbuss full of charges, mostly based on the common law of contracts but with trademark and antitrust allegations thrown in, against Westowne's former supplier, the Brown Shoe Company of antitrust fame. The district court granted summary judgment for Brown and we must therefore resolve factual disputes as favorably to Westowne as the record permits.

Brown manufactures a popular line of women's dressy shoes under the name "Naturalizer." Beginning in the early 1970s, Brown sold Naturalizers to Westowne for resale. It also licensed Westowne to use the name "Naturalizer" as part of Westowne's trade dress; that is, Westowne was permitted to use the name on its store signs (Brown even furnished the signs) and thus represent the stores to the consuming public as being authorized Naturalizer dealers. Westowne and the other licensees were not forbidden to sell other brands, and Westowne supplemented Naturalizers with women's casual shoes made by the San Antonio Shoe Company, but 80 to 90 percent of the shoes that it sold were Naturalizers.

In 1987 Brown instituted (actually reinstituted, but that is a detail we can ignore) its curiously named "purity" program, the focus of Westowne's wrath. Under this program, any store that wanted to retain "Naturalizer" in its sign, that is, wanted to represent itself as an authorized Naturalizer dealer or Naturalizer specialty store, had to cease selling brands other than Naturalizer. Brown was willing to continue selling Naturalizers to stores that carried other brands, but it required them to delete the word "Naturalizer" from their store signs and gave them a lower priority in the filling of orders.

The problem with "going pure" was that the Naturalizer line was not complete. It had dressy shoes, but not casual ones. So along with or as part of the purity program—for all we know, it was a principal purpose of the program—Brown developed a line of women's casual shoes under the Naturalizer label. It told Westowne that these shoes would be "stitch-by-stitch knockoffs"—that is, perfect imitations—of the popular SAS shoes. According to testimony that we must accept as true for purposes of this appeal, though without vouching for its truth, Brown's attempt to develop SAS "knock-offs" was a flop. They were so bad that not only was Westowne, which wanted to remain an authorized Naturalizer dealer and therefore stopped buying from SAS and began buying the knock-offs instead, unable to sell them; they also degraded the Naturalizer mark, making it difficult for Westowne to sell even the good Naturalizers—the original, dressy line—at a profit. Compounding Westowne's problems, it found it increasingly difficult to obtain the good Naturalizers. Brown has an "in stock" program, under which it maintains a large inventory of shoes from which to restock its dealers, enabling them to minimize their own inventory expense. As part of what Westowne describes as Brown's effort to monopolize the shoe business, Brown was busy buying up retail outlets and allocating all available inventory to them, thus starving independent dealers like Westowne; and it also sold to its own outlets at a lower price. Eventually Westowne went under and, owing Brown a considerable sum for shoes delivered but not paid for, brought this suit.

Westowne argues that Brown committed a breach of contract by putting Westowne to the miserable choice of losing its Naturalizer dealership (that is, the right to represent its stores as Naturalizer dealers) or replacing the SAS shoes that it carried with inferior knock-offs. The only written contract was the licensing agreement, and it does not bear on this contract claim. Westowne's argument is that the course of dealing between the parties, not any written contract, gave Westowne a contractual entitlement to remain a Naturalizer dealer indefinitely and forbade Brown to impose unrea-

sonable conditions on the retention of the dealership, such as requiring the dealer to carry a substandard product. Westowne points out that the Wisconsin Fair Dealership Law, Wis. Stat. ch. 135, creates such an entitlement. True; but this is not a suit under the dealership act; such a suit would be barred by the act's one-year statute of limitations. Wis. Stat. § 893.93(3)(b). Westowne's argument that the act creates entitlements which can then be enforced by a suit under the common law of contracts, with its six-year statute of limitations, Wis. Stat. § 893.43, is a transparent evasion of the statute of limitations in the dealership act.

The absence of a *written* contract other than the irrelevant licensing agreement and the multitudinous sales contracts, also irrelevant, covering particular shipments of shoes to Westowne's stores is not critical to the common law contract claim, because Brown has not raised a statute of frauds defense. What is critical is the absence of terms. Westowne's principal testified that he had a contract with Brown, but he was unable to answer such questions as, When did the contract start? When or under what conditions does it terminate? Is the "purity" program a violation? Did Brown so far relinquish its rights over its trademark as to entitle Westowne to sell another manufacturer's shoes from a store that holds itself out to be a Naturalizer dealership? What consideration did Brown receive for this trademark-endangering concession? The common law of contracts does not empower a court to write the parties' contract for them, *Witt v. Realist, Inc.*, 18 Wis.2d 282, 118 N.W.2d 85, 93–94 (1962); *Messner Manor Associates v. Wisconsin Housing & Economic Development Authority*, 204 Wis.2d 492, 555 N.W.2d 156, 159 (App.1996); *Goldstick v. ICM Realty*, 788 F.2d 456, 461–62 (7th Cir.1986), but that is what Westowne is asking us to do.

Westowne also argues, however, that by promising it perfect imitations of SAS shoes, Brown induced it to forgo its remedies under the Wisconsin Fair Dealership Law until the statute of limitations ran out. (Under that law, according to Westowne, Brown could not have forced Westowne to give up its Naturalizer dealership just because Westowne insisted on continuing to carry SAS shoes.) Brown should therefore be estopped to—to what? Westowne is not very clear about this, but the only answer can be—to plead the statute of limitations in a suit under the dealership law. A defendant who takes steps to prevent the plaintiff from suing within the statute of limitations is equitably estopped to plead it. *Hester v. Williams*, 117 Wis.2d 634, 345 N.W.2d 426, 431 (1984); *Poeske v. Estreen*, 55 Wis.2d 238, 198 N.W.2d 625, 628–29 (1972); *Bell v. Employers Mutual Casualty Co.*, 198 Wis.2d 347, 541 N.W.2d 824, 834 (App.1995); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir.1990); *Tiberi v. CIGNA Corp.*, 89 F.3d 1423, 1429 (10th Cir.1996). But this principle presupposes a suit to which the statute of limitations has been interposed as a defense, in this case a suit under the Wisconsin Fair Dealership Act. Westowne has not sued under that act. We do not think it is permitted to recycle the statutory claim that it failed to make as a common law claim of promissory estoppel in which damages are sought, much as in a suit for legal malpractice, for the loss of the statutory claim. That approach would require speculation about what Westowne's remedies under the dealership law might have been had it sued under that law. Unnecessary speculation: unlike a case of legal malpractice, where the suit the lawyer botched is gone forever, a plaintiff who claims that the defendant by promises or otherwise prevented him from bringing a timely suit can bring an untimely suit against that defendant on the identical claim on which the timely suit would have been based. To disguise a statutory claim as a claim for promissory estoppel in an unnecessary effort to beat a statute of limitations is a formula for confusion, and the district court is not required to tolerate it. *Sams v. United Food & Commercial Workers Int'l Union*, 866 F.2d 1380, 1385 (11th Cir.1989).

Westowne makes the alternative argument for promissory estoppel—an argument happily free from any dependence on the unpleaded dealership law—that it relied on the promise of the stitch-by-stitch knockoffs by "going pure," that is, by discontinuing

its purchases of SAS shoes. Yet at the same time it argues that it had to go pure because it could not afford to give up the Naturalizer sign. This means that it would have gone pure even if Brown had not promised a perfect substitute. So the promise made no difference. The promise is also the basis for Westowne's claim of misrepresentation, and fails for the same reason. Fraud is not actionable without harm. If, as Westowne itself asserts, it would have gone pure to retain its dealership, regardless of any representation concerning the SAS knock-offs, those representations caused it no harm. No harm, no tort. *Schicker v. Leick,* 40 Wis.2d 295, 162 N.W.2d 66, 69 (1968); *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1372 (7th Cir.1990) (applying Wisconsin law).

■ Westowne has other arrows in its quiver. It claims that Brown violated the trademark license by degrading the Naturalizer trademark by affixing it to the unwearable, unsalable knock-offs. While a trademark licensee (at least if he has an exclusive license), as well as the trademark's owner, can sue to protect the trademark from infringement, *G.H. Mumm Champagne v. Eastern Wine Corp.,* 142 F.2d 499, 502 (2d Cir.1944) (L. Hand, J.); *Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137, 142 (5th Cir.1972); 1a Jerome Gilson, *Trademark Protection and Practice* § 816[1][b], pp. 8–360 to 8–361 (1987), he cannot sue the trademark owner for "infringing" the trademark. *Silverstar Enterprises v. Aday,* 537 F.Supp. 236, 240–41 (S.D.N.Y.1982). There is no basis in either the federal or the state law of unfair competition for such a claim. The owner can if he wants, unless contractually committed otherwise, abandon the trademark, dilute it, attach it to goods of inferior quality, attach it to completely different goods—can, in short, take whatever steps he wants to jeopardize or even completely destroy the trademark. When cases speak of the trademark owner's "duty to ensure the consistency of the trademarked good or service," *Gorenstein Enterprises v. Quality Care–USA, Inc.,* 874 F.2d 431, 435 (7th Cir. 1989); see also 2 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.14[1], pp. 18–64, 18–66 (1996),

they mean that it is a condition of the continued validity of the trademark, see *id.,* § 18.15, pp. 18–74 to 18–74.1, or a defense to a consumer's claim of having been fooled by the substitution of an inferior good, not that it is a ground for a licensee's being allowed to sue to force the trademark owner to take steps to assure the trademark's continued validity.

■ We think that Westowne more or less understands all this, and is making solely a contract claim—that the trademark license obligated Brown to keep the Naturalizer mark up to snuff. A licensor might so promise, but this licensor did not. Westowne is asking us to make such a promise an *implied* term of every trademark licensing agreement, and that would be absurd. It would give licensees comprehensive power over the licensor's business—in this case power to tell Brown what kind or quality of shoes it can manufacture and sell under the Naturalizer label. Few licensors would agree to that, and there is no evidence that Brown is one of them. The office of implied contractual terms is to save contracting parties costs of negotiations by interpolating terms that they are pretty sure to have agreed to had they thought about the matter, not terms that they would be almost sure to reject; for the interpolation of *such* terms would increase rather than decrease the costs of contracting as parties busied themselves contracting around the interpolated terms. We add that Westowne's trademark claim is inconsistent with its other claims, all of which are premised on the continued potency of the Naturalizer mark.

■ Last, Westowne has an antitrust claim. It bases this claim—that Brown impaired competition by conditioning its dealers' use of the Naturalizer mark on their agreeing to carry the knock-offs, cf. *Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698, 704–06 (7th Cir.1984)—on Wisconsin rather than federal antitrust law. Wis. Stat. ch. 133. Under federal law, the claim could not take one step toward first base, since Westowne is unprepared to show that Brown's effort to confine Naturalizer dealers to shoes made by Brown could have

any effect on competition in the shoe business. It could have an effect, maybe, if Naturalizer dealers were the only outlets for SAS shoes in Wisconsin and if having a sign outside your store that says "Naturalizer Dealer" is such a valuable asset that you'll replace your SAS shoes with an unmarketable substitute. Neither condition is plausible, and concerning the first there is not a shred of evidence—not even the self-serving testimony of Westowne's principal, which is the only evidence for the second condition, the immense value of the Naturalizer mark that Brown with extreme perversity is (according to Westowne) doing its best to destroy.

Westowne's hope is that Wisconsin antitrust law is more archaic than federal. Since there is much more federal than state antitrust litigation, a state antitrust case is more likely to remain unrevisited by the court that rendered it and therefore untouched by the winds of change that have been blowing through the antitrust fields in recent decades than a federal antitrust case. Westowne relies on what it hopes is such a case, *Johnson v. Shell Oil Co.*, 274 Wis. 375, 80 N.W.2d 426 (1957). The defendant refused to allow its dealers to use the Shell trademark in conjunction with the gasoline of its competitors, but did allow them to sell that gasoline from other pumps on its premises, pumps not labeled "Shell." The Supreme Court of Wisconsin held that this arrangement did *not* violate the state's antitrust law. The holding is obviously of no value to Westowne—in fact is adverse to it—but Westowne likes the standard used by the court—a "partial restraint of trade, where effected for a proper purpose and limited in time and scope and otherwise reasonable[, is] not invalid." *Id.* 80 N.W.2d at 429. This is the same test that is used for covenants not to compete found in contracts for the sale of a business and in employment contracts. It is a part of the common law of restraint of trade rather than of statutory antitrust law, but *Johnson* borrowed it for use in interpreting the state's antitrust statute, as had an earlier case, *Ruhland v. King*, 154 Wis. 545, 143 N.W. 681 (1913). Westowne argues that Brown had an improper, namely an anticompetitive, purpose in forbidding its Naturalizer dealers to carry its competitors' brands, failed to limit the prohibition in time or scope, and, especially considering the lousy quality of the SAS knock-offs, acted unreasonably.

The *Johnson* case is 40 years old, and *Ruhland* far older, and since then the Supreme Court of Wisconsin has ruled that the decisions of the federal courts interpreting federal antitrust law shall control the interpretation of Wisconsin's antitrust law. *Grams v. Boss*, 97 Wis.2d 332, 294 N.W.2d 473, 480 (1980); *Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 405 N.W.2d 354, 367 (App. 1987). But we need not look beyond *Johnson*, because it dooms Westowne's antitrust claim. *Johnson* holds that a supplier is not required to allow his dealers to use his trademark to designate his competitors' products. Such a requirement would diffuse the goodwill associated with his trademark by associating it with a competitor's product and would jeopardize the trademark by allowing it to stand for products of different quality.

AFFIRMED.